438 F.3d 214
 Robert COLAVITO, Plaintiff-Appellant,
v.
NEW YORK ORGAN DONOR NETWORK, INC., Rob Kochik, Spencer Hertzel, Good Samaritan Hospital Medical Center, Doe, I and II, M.D. Dr., Defendants-Appellees.
Docket No. 05-1305 CV.
 United States Court of Appeals, Second Circuit.
 Argued: October 18, 2005.
 Decided: February 23, 2006.
 
 COPYRIGHT MATERIAL OMITTED Victor M. Serby (Denise Winter Luparello, of counsel), Woodmere, NY, for Plaintiff-Appellant.
 Richard E. Lerner, Wilson, Elser, Moskowitz, Edelman & Dicker P.C., New York, NY, for Defendants-Appellees New York Organ Donor Network, Inc., Robert Kochik, and Spencer Hertzel.
 Before: JACOBS, CABRANES, and SACK, Circuit Judges.
 SACK, Circuit Judge.
 
 
 1
 When, in August 2002, Peter Lucia died in a Long Island, New York, hospital of intra-cranial bleeding, his widow decided to donate both of his kidneys to his long-time friend, the plaintiff Robert Colavito, who was suffering from end-stage renal disease. Peter Lucia's left kidney was therefore air-lifted to a hospital in Miami, Florida, where Colavito was waiting for its implantation. Lucia's right kidney remained in New York.
 
 
 2
 While Colavito was being prepared for surgery, his surgeon, Dr. George W. Burke, discovered that Lucia's left kidney was irreparably damaged by aneurysms and therefore unfit for implantation. When a member of Burke's staff called the New York Organ Donor Network ("NYODN") to ask for delivery of the second kidney, he was told that it had already been delivered to and implanted in another patient. As the intended donee, Colavito brought this lawsuit in the United States District Court for the Eastern District of New York for fraud, conversion, and violations of New York Public Health Law Articles 43 and 43-A, invoking the court's diversity jurisdiction.[1]
 
 
 3
 The district court (Dora L. Irizarry, Judge) granted summary judgment to the defendants, rejecting Colavito's fraud claim on the merits, and concluding that his remaining claims were barred by a common-law public policy against recognizing property rights in human corpses. Colavito v. N.Y. Organ Donor Network, Inc., 356 F.Supp.2d 237 (E.D.N.Y.2005). We affirm the dismissal of Colavito's fraud claim, but reserve judgment as to those portions of plaintiff's appeal that pertain to the remainder of the district court's rulings. We think that New York public policy respecting organ donations is more likely to be properly determined by reference to its current relevant statutory law than common-law principles. New York Public Health Law Article 43 codifies New York's version of the Uniform Anatomical Gift Act, and New York Public Health Law Article 43-A, establishes "duties of hospital administrators, organ procurement organizations, eye banks and tissue banks." In light of our decision to certify substantive law questions to the New York Court of Appeals, however, we leave that ultimate determination of New York public policy to that court. Because Colavito's claims raise novel questions of statutory interpretation that have not yet been addressed by the New York courts, we will certify the following questions to the New York Court of Appeals: 1) Do the applicable provisions of the New York Public Health Law vest the intended recipient of a directed organ donation with rights that can be vindicated in a private party's lawsuit sounding in the common law tort of conversion or through a private right of action derived from the New York Public Health Law? 2) Does New York Public Health Law immunize either negligent or grossly negligent misconduct? 3) If a donee can bring a private action to enforce the rights referred to in question 1, may the plaintiff recover nominal or punitive damages without demonstrating pecuniary loss or other actual injury?
 
 BACKGROUND
 
 4
 In setting forth the facts underlying this appeal from the district court's grant of summary judgment to the defendants, we construe the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in his favor. See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir.2005).
 
 
 The Attempt at a Transplant
 
 
 5
 On August 21, 2002, Peter Lucia died from intra-cranial bleeding at Good Samaritan Hospital, in West Islip, New York. Joint Appendix ("J.A.") at 122. His widow, Debra Lucia, and their sons, decided to donate one of Peter's kidney to his friend, Robert Colavito, a resident of Coral Springs, Florida, who was suffering from end-stage renal disease. J.A. at 10, 129.
 
 
 6
 The Lucias first told a hospital nurse about their decision. Defendant Spencer Hertzel, an NYODN official, was then summoned to meet with the Lucias. J.A. at 132. Hertzel told Debra Lucia that her husband had had a "universal blood type," which made him a "universal donor." J.A. at 134-35. Hertzel then helped her fill out a printed organ-donor form by reading aloud questions from the form and writing down her answers. J.A. at 137. Sometime thereafter, she signed the donor form.[2]
 
 
 7
 One Carrie Comellas joined the meeting.[3] She said that to avoid damaging a donated kidney, both kidneys are usually removed from the donor's body together, as a unit. J.A. at 140-41, 255. Hertzel and Comellas offered Debra Lucia the option of separating the kidneys after their removal from Peter Lucia's body and returning the one not donated to his body for burial. Instead, Lucia "decided to send the both of them [to Colavito] for fear of something going wrong with them damaging one of the kidneys." Dep. of Debra Lucia, June 17, 2004 (Lucia Dep.), at 30; J.A. at 144.
 
 
 8
 The donation form contained a printed list of possible organs for donation. Def.'s Mot. for Summ. J., Aug. 6, 2004, Ex. G.; J.A. at 110. Hertzel placed a check mark next to the entry for "Kidneys." Id. In response to the form's question whether the non-transplanted organs could be used for medical research, Hertzel placed a check mark next to "no." Id. Next to an entry for "Directed Donation," Hertzel placed a check mark next to "yes." Id. And next to "Organ/tissue to be directed," he wrote the word "KIDNEY." Id. Upon completion, the form also stated: "If it is not feasible for medical or logistical reasons for the donated organs/tissue to be used by the person to whom I direct it, the NYODN may allocate the organs/tissue as if I had not made a directed donation," with the word "tissue" thus crossed out by hand in two places. Id. Debra Lucia told Hertzel that the kidneys were a directed donation specifically for Colavito. Lucia testified that "[t]hey were not for anyone else and I told him that specifically." Lucia Dep. at 38; J.A. at 152. Had Lucia known that the kidneys could not be used by Colavito, she said, she would never have consented to their removal: "There was no question about them being not transplantable. [Colavito] was a universal blood type, and therefore, he was compatible. Had [Hertzel] told me any other thing, I would not have donated them." Id. at 39; J.A. at 153.
 
 
 9
 Debra Lucia testified that she never discussed with Hertzel what would happen to the second kidney if the first one were transplanted successfully. But her understanding was that "[a]s long as Bobby [Colavito] was taken care of and he was fine, then the kidney could be given to another person."[4] Id. at 64-65; J.A. at 178-79. Lucia testified that "[w]hat I wanted more than anything was for Bobby to get a functioning kidney. If they needed both of them, that would have been fine. If they needed one, that would have been fine also. But he was to be taken care of." Id. at 64; J.A. at 178.
 
 
 10
 Colavito was a resident of South Florida. Debra Lucia asked whether Colavito should come to New York for the transplant, but Comellas told her that it would be easier to ship the kidneys interstate by airplane than to transport them across town for implantation. J.A. at 141. Peter Lucia's left kidney was therefore sent by air to Miami.
 
 
 11
 On August 23, 2002, two days after Peter Lucia's death and at about the time his left kidney arrived in Miami, Colavito was admitted to Jackson Memorial Hospital in Miami. J.A. at 233. The hospital staff prepared him for surgery. He was then taken to the surgical waiting area and told, "We go in 5 minutes." Decl. of Robert Colavito dated Sept. 4, 2004, ¶ 32; J.A. at 235. When Colavito asked a hospital nurse for confirmation that the kidney was compatible, he was told: "We wouldn't be here if it wasn't compatible." Id. at ¶ 31; J.A. at 235.
 
 
 12
 But before the five minutes had elapsed, Dr. Burke told Colavito that there was a problem. J.A. at 235. While inspecting the kidney, the surgeon had discovered that renal arteries on the kidney were damaged by aneurysms, rendering the kidney transplant medically untenable. J.A. at 88, 236. A member of Burke's staff therefore called the NYODN and asked that Peter Lucia's other kidney be sent. The person speaking for NYODN replied that the organ had already being used for another patient. J.A. at 83. NYODN organ placement documents indicate that a call was placed from Jackson Memorial Hospital in Miami asking for the right kidney at 1:00 p.m. and that the right kidney had already been directed to another patient, Edith Bravo, at 11:25 a.m.[5] J.A. at 241. Dr. Burke did not relay to Colavito what he had learned from the NYODN regarding the second kidney.
 
 
 13
 Without a kidney to implant, Dr. Burke sent Colavito home. Subsequent tests indicated that, in fact, both kidneys were histo-incompatible with Colavito's antibodies and therefore could not have been successfully transplanted in any event. But apparently neither Dr. Burke nor NYODN officials knew of the test results at the time Colavito was sent home, nor did they inform Colavito when they leaned about the results of the histo-compatibility tests. J.A. at 88.
 
 
 14
 Later that afternoon, Colavito and his wife, unaware that both of Peter Lucia's kidneys were histo-incompatible and therefore unsuitable for implantation, called Debra Lucia to find out what had happened to the second kidney. J.A. at 159-60. The Lucias' son, Peter, called Hertzel, who said that "his hands were tied" and gave them the telephone number of another NYODN official. Lucia Dep. at 46; J.A. at 160. Debra and the younger Peter Lucia spoke to that NYODN official who said it was not NYODN's fault that Dr. Burke had waited until approximately 2:00 p.m. to examine the first kidney.[6] J.A. at 161. The official also informed the Lucias that the kidney was already being implanted in someone else. J.A. at 166.
 
 
 15
 The next day, Debra Lucia spoke to the director of clinical operations at NYODN, the defendant Robert Kochik. J.A. at 163-64. Kochik told her that "this [had] never happened before" and promised to put Colavito at the top of the organ recipient list. Id. at 51; J.A. at 165. At no time during these conversations did anyone tell the Lucias or Colavito that the kidneys were histo-incompatible.
 
 
 16
 About one month later, while Colavito was preparing to consult a lawyer with respect to these events, he was told for the first time that "cross-match" testing results showed that the kidneys had been incompatible with his antibodies. J.A. at 237. Dr. Burke testified that "somewhere after I had already made the decision this kidney [the first one] was not a viable kidney for transplantation, hours later, I was informed about the crossmatch results," i.e., he had been told weeks before Colavito learned about the test results. Dep. of Dr. George W. Burke, May 10, 2004, at 20; J.A. at 90. In light of the results of the cross-match test, Burke said, he would not have implanted either the right or the left kidney in Colavito. J.A. at 78. He also explained that surgical preparation and laboratory tests such as cross-matching are often done simultaneously to save time. J.A. at 90.
 
 
 17
 The defendants also submitted an affidavit from putative expert Dr. Robert Gatson stating that he had reviewed the relevant histo-compatibility studies and concluded that the antibodies of Colavito would have attacked the kidney immediately after transplantation and destroyed it. J.A. at 105. Gatson stated that "based on the histo[-]compatibility studies, it would have been a departure from good and accepted medical practice to have transplanted either the right or the left kidney of donor Peter Lucia into the body of recipient Robert Colavito." Aff. of Robert S. Gaston dated May 13, 2004, ¶ 10; J.A. at 105.
 
 
 18
 Colavito continues to suffer from renal failure and remains on dialysis. J.A. at 296. The district court noted in its opinion that NYODN has since offered Colavito seven kidneys, without success. Two were found to be diseased; the other five were found to be incompatible. Colavito, 356 F.Supp.2d at 241 n. 8.
 
 
 Proceedings in the District Court
 
 
 19
 On August 22, 2003, Colavito brought suit in the United States District Court for the Eastern District of New York against the NYODN, Kochik, Hertzel, the Good Samaritan Hospital Medical Center, and two "Doe, M.D. defendants," invoking the court's diversity jurisdiction.[7] In his complaint, Colavito asserts causes of action sounding in fraud, conversion, and violation of the New York Public Health Law, Article 43 and 43-A.
 
 
 20
 After discovery, the parties all moved for summary judgment.[8] The defendants argued that the district court lacked diversity jurisdiction because Colavito had failed to allege an amount in controversy exceeding $75,000. The court rejected this argument, reasoning that even if the kidney itself was worthless to the plaintiff, Colavito could theoretically recover punitive damages that would clear the $75,000 threshold because he alleged purposeful misdirection of the organ. Colavito, 356 F.Supp.2d at 240-41.
 
 
 21
 The district court then rejected Colavito's fraud claim on the merits, reasoning that Colavito had failed to present evidence establishing that he detrimentally relied on the NYODN's alleged misrepresentations. Id. at 241. Finally, the court dismissed Colavito's remaining claims, concluding that because it is "against public policy to recognize broad property rights in the body of a deceased," Colavito could not prevail in a common law action for conversion or a claim based on the New York Public Health Law. Id. at 246.
 
 
 22
 Colavito appeals.
 
 DISCUSSION
 I. Standard of Review
 
 23
 We review de novo a district court's grant of summary judgment, including its determination of its own jurisdiction, see Hachamovitch v. DeBuono, 159 F.3d 687, 693 (2d Cir.1998); Hotel & Rest. Employees Union Local 217 v. J.P. Morgan Hotel, 996 F.2d 561, 564 (2d Cir.1993), and any "legal issue of statutory interpretation," White v. Shalala, 7 F.3d 296, 299 (2d Cir. 1993); see also LaSalle Bank, 424 F.3d at 205. We also "review de novo a district court's determination of state law." Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991); accord Elliott Assocs., L.P. v. Banco de la Nacion, 194 F.3d 363, 370 (2d Cir.1999).
 
 II. Subject Matter Jurisdiction
 
 24
 Because Colavito invokes the diversity jurisdiction of the district court, the amount in controversy must exceed $75,000. 28 U.S.C. § 1332. In each of the three causes of action that he asserts — for fraud, conversion, and violation of the New York Public Health Law—he seeks $10 million in compensatory damages and $30 million in punitive damages. Different state claims brought by a single plaintiff may be aggregated for purposes of satisfying the amount-in-controversy requirement. See Hall v. EarthLink, 396 F.3d 500, 507 (2d Cir.2005); Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc., 166 F.3d 59, 61-62 (2d Cir. 1999). Each claim, and their sum, thus easily exceed the jurisdictional requirements of section 1332.
 
 
 25
 But the defendants argue that these figures are vastly and fatally overstated. Although the party invoking federal jurisdiction must show by a "`reasonable probability'" that the amount-in-controversy requirement is satisfied, Tongkook Am., Inc. v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir.1994) (quoting Moore v. Betit, 511 F.2d 1004, 1006 (2d Cir.1975)), we recognize "a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy," Wolde-Meskel, 166 F.3d at 63. In order to rebut this presumption, the defendant must show that the complaint "was so patently deficient as to reflect to a legal certainty that [the plaintiff] could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." Id.
 
 
 26
 The defendants argue that the mis-delivered kidney—and therefore the amount in controversy—cannot be worth more than $75,000 because 1) it is contrary to New York's public policy to give an organ an objective fair market value,[9] and 2) Lucia's kidney was histo-incompatible with Colavito's immune system and therefore worthless to Colavito. The district court sidestepped these arguments by focusing on the possibility of punitive damages. See Colavito, 356 F.Supp.2d at 240. The court concluded that Colavito could theoretically recover more than $75,000 in punitive damages on his fraud claim because he "alleged purposeful misdirection of an organ donation," which would constitute fraud that "`is gross and involves high moral culpability.'" Id. (quoting Shanahan v. Vallat, 2004 WL 2937805, at *11, 2004 U.S. Dist. LEXIS 25523, at *36 (S.D.N.Y.2004)).
 
 
 27
 We think that the district court was likely correct that, under New York law, a plaintiff can ordinarily recover punitive damages for wanton and willful conduct even when there are only nominal compensatory damages. See, e.g., Ligo v. Gerould, 244 A.D.2d 852, 853, 665 N.Y.S.2d 223, 224 (4th Dep't 1997); Bryce v. Wilde, 39 A.D.2d 291, 293, 333 N.Y.S.2d 614, 616 (3d Dep't) ("Punitive damages [in a tortious interference with contract case] are not recoverable alone although they may be based upon an award of nominal compensatory damages and there must be actual malice shown on the part of a defendant."), aff'd, 31 N.Y.2d 882, 292 N.E.2d 320, 340 N.Y.S.2d 185 (1972); see also Action House, Inc. v. Koolik, 54 F.3d 1009, 1013 (2d Cir.1995) ("Had nominal damages been awarded [with respect to breach of fiduciary duty and misappropriation claims], we believe that an award of punitive damages would have been consistent with New York law.") (citing Bryce, 39 A.D.2d at 294, 333 N.Y.S.2d 614); Reinah Dev. Corp. v. Kaaterskill Hotel Corp., 59 N.Y.2d 482, 487, 452 N.E.2d 1238, 1240, 465 N.Y.S.2d 910, 912 (1983) (assuming that nominal damages award would support punitive award but concluding that punitive damages were not warranted on the facts). We therefore adopt the analysis of the district court.[10]
 
 III. Colavito's Fraud Claim
 
 28
 The district court correctly noted that under New York law,
 
 
 29
 [t]o establish a claim for fraud, plaintiff must show that (1) the defendants misrepresented a material fact; (2) the defendants knew they were making a false misrepresentation; (3) Mr. Colavito justifiably relied on such misrepresentation; and (4) he suffered harm as a result.
 
 
 30
 Colavito, 356 F.Supp.2d at 241 (citing Cohen v. Houseconnect Realty Corp., 289 A.D.2d 277, 278, 734 N.Y.S.2d 205, 206 (2d Dep't 2001)). Each element of a fraud claim must be proved by clear and convincing evidence. Hutt v. Lumbermens Mut. Cas. Co., 95 A.D.2d 255, 257, 466 N.Y.S.2d 28, 30 (2d Dep't 1983). The district court disposed of Colavito's fraud claim on the grounds that the only actions Colavito took in reliance on the alleged misrepresentation were "going to the hospital and preparing for surgery" and that doing so in vain did not constitute compensable harm. Colavito, 356 F.Supp.2d at 241.
 
 
 31
 On appeal, Colavito argues that he detrimentally relied not on the initial fraudulent statements that he would receive the kidney, but on NYODN's statements on August 23, 2002, that the second kidney had already been implanted in another patient. Colavito argues that the second kidney was actually implanted on August 26, and that the defendants "intentionally misrepresented to Plaintiff and to the Lucia family that the kidney had already been transplanted into someone else on August 23, 2002." Appellant's Br. at 31 (emphasis in original). Colavito says that these alleged misrepresentations prevented him from laying claim to the second Lucia kidney, which was rightfully his, before it was too late.
 
 
 32
 But Colavito has adduced no evidence to support his assertion that the NYODN officials knew on August 23 that the second kidney might remain available for Colavito's use. The only evidence in the record on summary judgment reflects statements on behalf of NYODN to Dr. Burke and the Lucias consistent with what was written in NYODN's internal documents at the time, i.e., that the kidney had by then been diverted elsewhere. On a motion for summary judgment "the opposing party may not rest upon mere conclusory allegations or denials." Markowitz v. Republic Nat'l Bank of N.Y., 651 F.2d 825, 828 (2d Cir.1981). "A plaintiff does not become entitled to a jury trial simply by asserting a cause of action in which the defendant's state of mind is a material element." Id. Without anything more than the assertion in his appellate brief, Colavito has not made a sufficient showing to create a genuine, triable issue of fact on this issue. And without one, his fraud claim must fail. We therefore affirm the district court's grant of summary judgment for the defendants on Colavito's fraud claim.
 
 IV. Determining New York Public Policy
 
 33
 Although the district court resolved Colavito's fraud claim on evidentiary grounds, it dismissed his remaining claims for failure to state a cause of action.
 
 
 34
 Before embarking on a discussion of whether the district court's legal conclusions were correct, we pause to note the obvious: There is a glaring anomaly in Colavito's case. Although he will not concede the point, the evidence strongly suggests that neither of Peter Lucia's kidneys was, it turned out, suitable for implantation in Colavito's body. It is, as a result, difficult to comprehend what compensatory damages Colavito might have suffered as a result of being deprived of the second Lucia kidney beyond the psychic or the nominal—and even that harm may have arisen from the defendants' failure to inform him promptly of the histo-compatibility test results, rather than from his loss of the kidney. Put another way, it may be possible to view the misdirected kidney as, from Colavito's perspective, no more than a dead and useless body part.[11] Indeed, it seems possible that this litigation might never have been brought had Colavito been told immediately, by his doctor or someone else, that the Lucia kidneys were, according to the tests, useless to him, rather than leaving him to think for weeks that his life had been put in serious jeopardy by the apparent misfeasance of the defendants.
 
 
 35
 Nevertheless, before we can resolve whether Colavito's claim is meritorious on these facts, we must address the antecedent question of whether he—or any organ donee—may bring such an action in the first place. We therefore proceed to review the district court's conclusion that Colavito's remaining claims were barred because recovery on them would be inconsistent with the public policy of New York State.
 
 
 A. Common Law
 
 
 36
 The district court concluded that Colavito could not bring a claim for conversion or a cause of action under the New York Health Law because it is "against public policy to recognize broad property rights in the body of a deceased." Colavito, 356 F.Supp.2d at 246. And it is true that at common law, there were no property rights in human corpses. "Under this rule, stealing a corpse, which by definition has no owner, was not a felony." Janicki v. Hosp. of St. Raphael, 46 Conn.Supp. 204, 213, 744 A.2d 963, 968 (1999) (citing William Blackstone, 4 Commentaries *236). As the Ninth Circuit has explained, duties with respect to corpses were excluded from actions at common law "because burials were matters of ecclesiastical cognizance." Newman v. Sathyavaglswaran, 287 F.3d 786, 791 (9th Cir.), cert. denied, 537 U.S. 1029, 123 S.Ct. 558, 154 L.Ed.2d 444 (2002). But in American courts,
 
 
 37
 [a]s cases involving unauthorized mutilation and disposition of bodies increased toward the end of the 19th century, paralleling the rise in demand for human cadavers in medical science and use of cremation as an alternative to burial, see In re Johnson's Estate, 169 Misc. 215, 7 N.Y.S.2d 81, 85-86 [N.Y. Surr.1938] (describing "an outpouring" of such cases), courts began to recognize an exclusive right of the next of kin to possess and control the disposition of the bodies of their dead relatives, the violation of which was actionable at law.
 
 
 38
 Id. at 791-92. As the district court recognized, these cases created the only exception to Blackstone's common-law rule: "a `quasi property' right, belonging to the spouse or next of kin to possess the body for the purposes of ensuring proper burial." Colavito, 356 F.Supp.2d at 244.
 
 
 39
 According to the district court, this common law public policy bars the plaintiffs from applying conversion claims to organ donations. In support of this ruling, the district court cited four cases: Perry v. Saint Francis Hosp. & Med. Ctr., Inc., 886 F.Supp. 1551, 1553 (D.Kan.1995) (holding that the plaintiffs were barred from recovering for breach of contract based on the defendant's removal of more body parts from the body of the deceased than were authorized); Shults v. United States, 995 F.Supp. 1270, 1275-76 (D.Kan.1998) (concluding that parents of a deceased airman had no claim for conversion where portions of their son's tissues and organs were discarded after autopsy); Bauer v. N. Fulton Med. Ctr., 241 Ga.App. 568, 571, 527 S.E.2d 240, 244 (1999) (holding that a widow could not maintain a claim for conversion based on the unauthorized removal of her husband's eye tissue); Hasselbach v. Mt. Sinai Hosp., 173 A.D. 89, 92, 159 N.Y.S. 376, 378-79 (1st Dep't 1916) (deciding that a widow could not sustain a conversion claim for an unauthorized autopsy performed on her husband). Based on this case law, the district court
 
 
 40
 agree[d] with the Georgia Court of Appeals in Bauer that it would be against public policy to engage in a valuation of Mr. [Lucia's] kidneys, which are not property. Based on the case law discussed above, the court also finds it inappropriate to expand the limited right that courts recognize in a deceased's body, which only belongs to the next of kin to ensure proper burial.
 
 
 41
 Colavito, 356 F.Supp.2d at 244 (citation and footnote omitted). But if there is indeed a public policy against finding property rights in donated organs, we do not think that these common-law cases establish it.
 
 
 42
 First, there is by no means a modern consensus that body parts are excluded from conversion actions at common law. In Wint v. Ala. Eye & Tissue Bank, 675 So.2d 383, 384-86 (Ala.1996), for example, the Alabama Supreme Court recognized, in this context, actions for conversion and trespass to chattels, although it ultimately determined that the plaintiff had failed to adduce sufficient evidence to withstand summary judgment. Cf. Cornelio v. Stamford Hosp., 246 Conn. 45, 717 A.2d 140, 143 n. 6 (1998) (assuming, without deciding, that plaintiff had a property interest in pap smear specimens and noting that the existence of property rights in body parts is a "new, and thorny, question" that "has as yet been the subject of very little authority and commentary").
 
 
 43
 New York's Hasselbach case, meanwhile, is nearly ninety years old. It was, of course, decided decades before organ transplants became medically viable; longer still before New York adopted the Uniform Anatomical Gift Act. It is hardly instructive, let alone dispositive, in determining current New York public policy on the subject.
 
 
 44
 Second, all of the cases the district court cited involved lawsuits by a decedent's relatives about the preservation of body parts of the dead. The courts that have declined to treat this sort of claim as asserting a valid property right have explained that it should have been brought as a claim for emotional distress—which indeed is the gravamen of the injury bereaved families seek to redress in such circumstances. Usually, to recover for the tort of negligent infliction of emotional distress, a plaintiff must show that he or she suffered a physical injury. But because the mishandling of a corpse is presumed to be emotionally distressing even though there is no physical impact on the plaintiff, courts have created the legal fiction of the "quasi-property right" to which the district court referred to permit recovery in such cases. Colavito, 356 F.Supp.2d at 244. "If the plaintiff could show that his property right had been harmed, he would avoid the burden of proving that his emotional distress was accompanied by physical injury." Culpepper v. Pearl St. Bldg., Inc., 877 P.2d 877, 880 (Colo.1994) (en banc). Accordingly, "the technical [quasi-property] right has served as a mere peg upon which to hang damages for the mental distress inflicted upon the survivor; and in reality the cause of action has been exclusively one for the mental distress." Restatement (Second) of Torts § 868 cmt. a (1979).
 
 
 45
 We think that the district court drew the wrong lesson from these cases in the context of Colavito's asserted causes of action. It concluded that "the narrow rights in a deceased's body are reserved exclusively for the next of kin and only for purposes of ensuring proper disposition of the deceased's body." Colavito, 356 F.Supp.2d at 246. The control-over-corpse cases restrict the recovery of relatives to emotional distress because that is in fact what they suffered. But a lawsuit based on the loss of a donated organ typically seeks more than compensation for injured feelings. The intended recipient of a human organ does not bring suit for control over a dead body and its constituent parts. He or she sues for the loss of a functioning organ.
 
 
 46
 The district court's conclusion that "[c]ourts have also been reluctant to apply contract law to organ donations" thus does not follow from the decisions of courts dealing with the treatment of corpses. Plaintiffs such as Colavito are not using the term "property" as a legal fiction upon which to base a claim for emotional harm. They have—or assert that they have—a practical use for the organ, not a sentimental one.[12]
 
 
 B. New York Public Health Laws
 
 
 47
 Notwithstanding the District Court's conclusion to the contrary, it is arguable that under the New York Public Health Law, a person or entity may have an enforceable property right in a functioning organ. The statute declares: "The rights of the donee created by the gift are paramount to the rights of others . . . ." N.Y. Public Health Law § 4301(5). It also sets forth comprehensive rules for hospitals and organ donation networks in order to protect donors' and donees' interests. N.Y. Public Health Law § 4351. And it provides that "any person or organization acting pursuant to this [Act], shall be legally responsible for any negligent or intentional act or omission," N.Y. Pub. Health Law § 4351(7), suggesting the possibility of litigation seeking to enforce this very set of rights.
 
 
 48
 To be sure, the Act prohibits the "sales and purchases" of organs. See N.Y. Public Health Law § 4307. But the fact that the State wishes to prohibit the treatment of functioning human organs as though they were commodities does not necessarily imply that it also intends that no one can acquire a property right in them. It does not follow from a law that forbids the sale of a functioning human kidney, that a third party may with impunity take the organ against the express wishes of a potential donor and potential donee.
 
 
 49
 In other contexts, courts have been reluctant to expand common-law remedies when the legislature has remained silent. Cf. Moore v. Regents of the Univ. of Cal., 51 Cal.3d 120, 142, 793 P.2d 479, 493, 271 Cal.Rptr. 146, 160 (1990) (rejecting patient's claim of a common law property right in the use of his cells for research, in part because "problems in this area are better suited to legislative resolution"). But in Colavito's case, the New York legislature has spoken by adopting the Uniform Anatomical Gift Act and related public health laws. The district court reasoned that "the meaning of [the] statute is ambiguous [and] the court should avoid a construction that would be contrary to public policy." Colavito 356 F.Supp.2d at 246. But public policy is at least in part what a state, through its statutes, says it is. Plainly, the public policy of the state as indicated in its statute is not necessarily trumped by what the pre-existing common law suggests it used to be. Cf. Moore, 51 Cal.3d at 137, 271 Cal.Rptr. 146, 793 P.2d 479 ("It is these specialized statutes . . . to which courts ordinarily should and do look for guidance on the disposition of human biological materials.").
 
 
 50
 The New York statute carves out a specific and limited immunity provision: "A person who acts in good faith in accord with the terms of this article or with the anatomical gift laws of another state is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act." N.Y. Public Health Law § 4306(3). It thus seems to contemplate that private lawsuits will be used to vindicate rights in anatomical gifts. In the only New York case to interpret this part of the statute (albeit an eighteen-year-old decision of a trial court) the court concluded:
 
 
 51
 [T]he Legislature has created an objective standard by which the good faith of a [defendant] could be measured. The Uniform Anatomical Gift Act establishes a statutory scheme which outlines the means of effecting an anatomical gift, the classes of individuals entitled to effect such a gift, and the circumstances under which such a gift must be deemed null and void.
 
 
 52
 Nicoletta v. Rochester Eye & Human Parts Bank, Inc., 136 Misc.2d 1065, 1069, 519 N.Y.S.2d 928, 931 (Supreme Ct. Wayne Co.1987). The legislature has taken pains to establish a comprehensive regime, including a limited safe-harbor provision, which courts are obligated to enforce. "Where the Legislature has spoken, indicating its policy preferences, it is not for courts to superimpose their own." Morales v. County of Nassau, 94 N.Y.2d 218, 224, 724 N.E.2d 756, 759, 703 N.Y.S.2d 61, 64 (1999). "The rule cannot be otherwise for, as was long ago recognized, when courts attempt to define the limits of public policy without a firm foundation in precedent or law, they usurp the legislative function which is, of course, to define the public will." Kraut v. Morgan & Bro. Manhattan Storage Co., 38 N.Y.2d 445, 452, 343 N.E.2d 744, 748, 381 N.Y.S.2d 25, 29-30 (1976).
 
 IV. Certification
 
 A. Reasons to Certify
 
 
 53
 Identifying where New York public policy is likely to be found, however, is different from identifying what New York public policy is. As noted, Colavito asserts that by misdirecting Peter Lucia's second kidney, the defendants violated New York Public Health Law Article 43, which codifies the State's Uniform Anatomical Gift Act, and New York Public Health Law Article 43-A, which establishes the duties of hospital administrators and organ procurement organizations. N.Y. Public Health Law §§ 4301(3) and 4302(3) authorize directed donations to specific donees, and N.Y. Public Health Law § 4301(5) states that "[t]he rights of the donee created by the gift are paramount to the rights of others except as provided by [the section prohibiting sale and purchases of organs]."
 
 
 54
 The statutes also include specific provisions regarding immunity and liability. As we have noted, in Article 43, N.Y. Public Health Law § 4306(3) states that "[a] person who acts in good faith in accord with the terms of this article . . . is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act." In Article 43-A, N.Y. Public Health Law § 4351(7) provides for liability, stating that "[t]o the extent permissible under [section 4306], any person or organization acting pursuant to this section, shall be legally responsible for any negligent or intentional act or omission committed by such entity or its employees or agents."
 
 
 55
 The Uniform Anatomical Gift Act of 1968 sought to balance several competing interests. According to a prefatory note prepared by its proponent, the National Conference of Commissioners on Uniform State Laws:
 
 
 56
 [I]f utilization of bodies and parts of bodies is to be effectuated, a number of competing interests in a dead body must be harmonized, and several troublesome legal questions must be answered.
 
 
 57
 The principal competing interests are: (1) the wishes of the deceased during his lifetime concerning the disposition of his body; (2) the desires of the surviving spouse or next of kin; (3) the interest of the state in determining by autopsy, the cause of death in cases involving crime or violence; (4) the need of autopsy to determine the cause of death when private legal rights are dependent upon such cause; and (5) the need of society for bodies, tissues and organs for medical education, research, therapy and transplantation. These interests compete with one another to a greater or less extent and this creates problems.
 
 
 58
 Unif. Anatomical Gift Act of 1968, Prefatory Note. In analyzing these competing interests, one method of increasing donations may be to limit or foreclose liability for doctors and organ procurement and dissemination organizations, but another may be to give donors enforceable rights to ensure that their wishes in making such donations are carried out.
 
 
 59
 Within the framework of encouraging organ donations, New York has taken additional steps to honor the intent of the donor. In 1994, the legislature amended section 4301 to require that a donee shall not accept an organ if he or she "has actual notice of contrary indication by the decedent." 1994 N.Y. LAWS 62, at *1, codified at N.Y. Public Health Law § 4301(3)(a). According to the New York State Senate Introducer's Memorandum in Support, S.4528B, the purpose of the amendment was "[t]o make organ and tissue procurement more efficient by reaffirming the primacy of the intentions of the person donating and by clarifying the right of those who donate on behalf of the deceased." See Colavito, 356 F.Supp.2d at 246 (quoting 1994 N.Y. Laws, ch. 62, § 1).
 
 
 60
 New York adopted section 4351(7)'s provision, which holds agencies "legally responsible for any negligent or intentional act or omission," as part of a comprehensive scheme to identify donors and funnel requests through federally designated organ procurement organizations. The stated purpose of the 1997 amendments was "[t]o increase the supply of organs, by enhancing the process by which anatomical gifts are requested." N.Y. Bill Jacket, 1997 S.B. 5745 Ch. 668. Although we have found no record of a specific discussion of the "legally responsible" clause, the Division of Budget report noted generally that "[t]he provisions of this bill may increase costs for organ procurement organizations." Id.
 
 
 61
 Whether these provisions give rise to enforceable rights for individuals is extremely difficult for us to attempt to determine through an attempt to reduce the statutes' comprehensive framework to a generalized statement of public policy.[13] Encouraging private lawsuits by recognizing enforceable property rights may over-deter doctors and hospitals that need to act quickly to preserve life saving organs. But without statutory rights preserving personal preferences and legal remedies to enforce them, families might refuse to donate organs in the first place—as in this case: Debra Lucia testified that if she could not have directed the second kidney to Colavito, she would have buried it in the ground along with the rest of Mr. Lucia's body.
 
 
 62
 One may or may not agree with Mrs. Lucia's decision, but it would appear to be entirely permissible under the Uniform Anatomical Gift Act, which specifically allows for directed donations. N.Y. Public Health Law § 4302(4). And the reason for permitting it is to encourage her and others like her to make limited gifts rather than no gift at all. It is surely arguable that she and Colavito had an enforceable right to have their wishes as to the donation of those kidneys honored.[14]
 
 
 63
 "Where `unsettled and significant questions of state law will control the outcome of a case,' we may certify those questions to the New York Court of Appeals." Prats v. Port Auth. of N.Y. and N.J., 315 F.3d 146, 150-51 (2d Cir.2002) (quoting 2d Cir. R. 0.27) (alterations incorporated). "Certification is a discretionary device, both for the certifying court and for the court requested to answer the certified questions." McCarthy v. Olin Corp., 119 F.3d 148, 153 (1997) (quoting Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 51 (2d Cir.1992)) (alteration incorporated); see also Stitching Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 59 (2d Cir.2005) (Sack, J., concurring) (commenting that this rule "gives us relatively broad discretion as to when to certify, and . . . there are things other than our ability to predict New York law that can inform our decision as to whether or not to do so."). We think that there are several factors that make certification appropriate in this case.
 
 
 64
 First, here, the "statute's plain language does not indicate the answer." Riordan, 977 F.2d at 51.
 
 
 65
 Second, there are only five published state court opinions interpreting New York's Uniform Anatomical Gift Act, and only one of them—a trial court case—is remotely relevant to the issues before us. See Nicoletta, 136 Misc.2d 1065, 519 N.Y.S.2d 928; cf. Elliott Assocs., 194 F.3d at 370 ("Because it is our job to predict how the forum state's highest court would decide the issues before us, we will not certify questions of law where sufficient precedents exist for us to make this determination." (internal quotation marks and citation omitted).).
 
 
 66
 Third, law in this area reflects value judgments and public policy choices in which we have little experience, expertise, or authority. See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA, Inc., 344 F.3d 211, 221 (2d Cir.2003) ("The fact that resolution of this case will require analysis of important policy considerations of the state of New York also favors certification."). The generalized goals of increasing organ donations could plausibly be furthered either by shielding organ procurement organizations from liability or by giving donors and donees enforceable rights to remedy and deter misconduct. New York has an obvious interest in calibrating the right incentive structure for future organ donors, and persons and entities facilitating transplants, which it can do, in part, by adjusting the extent to which an organ will be used according to the wish of the donor even if contrary to what others might think to be the public good. We think it would be imprudent to embark on an excursion of our own into the state statutory incentive structure in this important and sensitive area of state law and policy. We therefore certify that question to the New York Court of Appeals.[15]
 
 
 B. Other Issues Certified
 
 
 67
 Colavito's claims also present several subsidiary questions of statutory interpretation that may also need to be resolved in order for us to be able to determine the possible scope of Colavito's rights and available remedies.
 
 
 68
 1. Implied Private Right of Action. As noted, if New York's Public Health Laws do vest Colavito with enforceable rights, it remains unclear whether those rights may be asserted by a common law action for conversion, by a private right of action implied from the public health laws, or both. If we were interpreting Articles 43 and 43-A as we interpret federal statutes, we would likely conclude that they do not imply a private right of action. Under current Supreme Court doctrine, whether a private right of action exists depends primarily on the "text and structure" of the statute itself. Alexander v. Sandoval, 532 U.S. 275, 288, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). The Uniform Anatomical Gift Act does say that the rights of the donee are paramount, but for federal statutes, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." Sandoval, 532 U.S. at 286, 121 S.Ct. 1511. Without evidence of legislative intent to create one, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." Id. at 286-87, 121 S.Ct. 1511.
 
 
 69
 Furthermore, N.Y. Public Health Law § 4366(3) provides that the attorney general may bring actions in state supreme court to enjoin violations of the articles or of its rules and regulations. This sort of "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Sandoval, 532 U.S. at 290, 121 S.Ct. 1511.
 
 
 70
 But here we must apply New York, not federal, law to interpret the statutes.
 
 
 71
 We are bound here, not by federal prudential requirements for an action brought under a federal statute or constitutional provision, but by this state's own requirements for implying a private right of action where the state statute has not explicitly provided for one, which requirements are fully set forth in the . . . controlling state cases.
 
 
 72
 Hammer v. Am. Kennel Club., 304 A.D.2d 74, 80, 758 N.Y.S.2d 276, 281 (1st Dep't 2003). New York appears to continue to follow the more lenient test for implying private rights of action, adapted from Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Under New York law,
 
 
 73
 the essential factors to be considered are: (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme.
 
 
 74
 Sheehy v. Big Flats Cmty. Day, Inc., 73 N.Y.2d 629, 633, 541 N.E.2d 18, 20, 543 N.Y.S.2d 18, 20 (1989); see also Pelaez v. Seide, 2 N.Y.3d 186, 200, 810 N.E.2d 393, 400, 778 N.Y.S.2d 111, 118 (2004). "[T]he most critical inquiry in determining whether to recognize a private cause of action where one is not expressly provided is whether such action would be consistent with the over-all legislative scheme." Brian Hoxie's Painting Co. v. Cato-Meridian Cent. Sch. Dist., 76 N.Y.2d 207, 212, 556 N.E.2d 1087, 1089, 557 N.Y.S.2d 280, 282 (1990).
 
 
 75
 In light of our uncertainty about the public policy underlying New York's legislative scheme, we include in our first question certified to the New York Court of Appeals whether Colavito has a private right of action implied from the New York Public Health Law to enforce the donor's wishes with respect to the organs intended for him.
 
 
 76
 2. Definition of "Good Faith." We are similarly unsure of the intended scope of the statutes' safe harbor provisions, which we may be required to apply in this litigation. Article 43 declares that "[a] person who acts in good faith in accord with the terms of this article . . . is not liable for damages in any civil action . . . for his act." N.Y. Pub. Health Law § 4306(3)
 
 
 77
 New York courts have noted that negligent acts can still be performed in "good faith." See, e.g., Berrios v. Our Lady of Mercy Med. Ctr., 20 A.D.3d 361, 363, 799 N.Y.S.2d 452, 454 (1st Dep't 2005) ("Although defendants' collective actions in misreading the x-rays, causing a police investigation and participating in invasive medical procedures certainly could be found to be negligent and the product of overzealousness, all evidence points to the conclusion that defendants were acting in good faith."); People v. Lunney, 84 Misc.2d 1090, 1094, 378 N.Y.S.2d 559, 564 (Sup.Ct.N.Y.County, 1975) (prosecutor's loss of grand jury minutes "was a `good faith' negligent loss").
 
 
 78
 And other states that intended to make defendants liable for negligence specifically amended their version of the Uniform Anatomical Gift Act to immunize only "person[s] who act without negligence and in good faith." Mo.Rev.Stat. § 194.270(3) (1996) (emphasis added); Fla. Stat. § 765.517(5) (2002) (Florida) (emphasis added). The fact that New York did not similarly refer to negligence in its version of the Uniform Anatomical Gift Act may imply that a negligent defendant could still be acting in good faith.
 
 
 79
 N.Y. Public Health Law § 4351(7), however, which was introduced in 1997 as part of Article 43-A, declares that "any person or organization acting pursuant to this section shall be legally responsible for any negligent or intentional act or omission." (emphasis added). It is not readily apparent whether the term "legally responsible" should be interpreted differently than the term "liable."[16] We think that the New York Court of Appeals, as the ultimate judicial arbiter of the meaning of New York State statutes, is the most appropriate judicial institution to reconcile these two standards.
 
 
 80
 3. Availability of Nominal or Punitive Damages. The defendants argue that any misdirection of the kidney was harmless because later tests revealed that the kidneys were histo-incompatible with Colavito's antibodies. Colavito contests the test results, albeit with very little evidence to support his position on the issue. It is clear, though, in any event that ultimate resolution of the case may turn on the whether Colavito can proceed with his claim if he cannot show any pecuniary loss or other actual damages.
 
 
 81
 Under general principles of New York law, a plaintiff apparently can proceed to trial on an action for conversion even if he or she is entitled only to nominal damages. See MacGuire v. Elometa Corp., 189 A.D.2d 708, 708, 592 N.Y.S.2d 730, 730-31 (1st Dep't 1993) ("While defendants urge that there are no damages since they ultimately satisfied all payment obligations which were secured by the stock certificates, nominal damages may be awarded as a result of the conversion and plaintiffs should be given an opportunity to prove at trial any other damages they sustained as a result of the conversion."). In addition, under New York law it appears that "[p]unitive or exemplary damages may be recovered for the conversion of personalty, where the circumstances show that the conversion was accompanied by malice, insult, reckless and willful disregard of the plaintiff's rights, or other proof showing the aggravated nature of the act." 23 N.Y. Jur.2d Conversion § 73 (footnotes omitted); see also Bryce, 39 A.D.2d at 293, 333 N.Y.S.2d at 616. Although the majority rule is that punitive damages may only be awarded if they are accompanied by compensatory damages, see Prosser & Keeton, The Law of Torts, § 2, at 14 (5th ed.1984), in New York nominal damages seem to be sufficient to support such an award, see Action House, Inc., 54 F.3d at 1013-14; see also additional cases cited in part II of this opinion, above.
 
 
 82
 Perhaps donors' and donees' rights may be similarly vindicated by an action for nominal and punitive damages without proof of special damages or actual injury. But it is also possible that these general principles of New York law are ill-suited to further the delicate incentive structure for organ donations. We think this question, too, is most appropriately answered in the first instance by the New York Court of Appeals.
 
 CONCLUSION
 
 83
 We therefore affirm the district court's grant of summary judgment to the defendants with respect to the plaintiff's fraud claim.[17] We reserve decision on the remaining issues before us on appeal, and hereby respectfully certify to the New York Court of Appeals the following questions: 1) Do the applicable provisions of the New York Public Health Law vest the intended recipient of a directed organ donation with rights that can be vindicated in a private party's lawsuit sounding in the common law tort of conversion or through a private right of action inferred from the New York Public Health Law? 2) Does New York Public Health Law immunize either negligent or grossly negligent misconduct? 3) If a donee can bring a private action to enforce the rights referred to in question 1, may the plaintiff recover nominal or punitive damages without demonstrating pecuniary loss or other actual injury?
 
 
 84
 In formulating the questions as we have here, we do not intend to limit the scope of the Court of Appeals' analysis or its response. The certified questions may be deemed expanded to cover any pertinent further issue that the Court of Appeals thinks it appropriate to address.
 
 
 85
 It is therefore hereby ORDERED that the Clerk of this Court transmit to the Clerk of the Court of Appeals of the State of New York a Certificate, as set forth below, together with a complete set of the briefs, appendix, and record filed in this Court by the parties. The parties are directed to bear equally such fees and costs as may be directed by the New York Court of Appeals. This panel retains jurisdiction so that after we receive a response from the New York Court of Appeals, we may dispose of the appeal.
 
 CERTIFICATE
 
 86
 The foregoing is hereby certified to the Court of Appeals of the State of New York, pursuant to New York Court of Appeals Rule 500.17 and United States Court of Appeals for the Second Circuit Rule 0.27.
 
 
 87
 [Colavito v. New York Organ Donor, 05-1305-cv (argued October 18, 2005)]
 
 
 
 Notes:
 
 
 [1]
 The donors, the Lucia family, have also brought suit against a variety of persons and entities in New York State court alleging fraud, battery, conversion, and violations of New York Public Health Law Article 43See Lucia v. N.Y. Organ Donor Network, Inc., No. 03-012981 (Supreme Ct. Nassau Co.).
 
 
 [2]
 It is not clear from the record whether Debra Lucia signed the organ donation form during her earlier conversation with Hertzel or after she decided to donate both kidneys to Colavito. J.A. at 151-52
 
 
 [3]
 Debra Lucia testified that she did not know whether Comellas was affiliated with NYODN or Good Samaritan Hospital. J.A. at 140
 
 
 [4]
 Hertzel's case report, written the next day, reflects a somewhat different understanding: "At first [Debra Lucia] said `no' when the second kidney, other organs, and tissue were requested. A few hours later after much discussion. . . [the Lucias] consented to donating the second kidney to the pool." Def.'s Mot. for Summ. J. Ex. F.; J.A. at 107. Members of the Lucia family strenuously denies ever donating the second kidney to "the pool." J.A. at 226. They say that they understood that both kidneys were being directed to Colavito
 
 
 [5]
 It was Dr. Burke's understanding that the other patient's surgery was already in progress at the time he discovered that Lucia's left kidney was damaged and could not be implanted into Colavito. J.A. at 94. But according to a NYODN form, her operation did not take place until three days later, on August 26. J.A. at 213. It is unclear whether the NYODN officials with whom Dr. Burke's staff spoke thought that the right kidney had actually been transplanted into the other patient as of 1:00 p.m. on August 23, or instead thought that it had only been directed to her. According to Hertzel's report on August 23, the kidney "had already been allocated locally and was being transplanted at the time the request was made." Def.'s Mot. for Summ. J., Aug. 6, 2004, Ex. F.; J.A. at 107
 
 
 [6]
 NYODN reports show that the phone call from Jackson Memorial Hospital to the NYODN was made an hour earlier, at 1:00 p.m., J.A. at 241, but the difference is immaterial
 
 
 [7]
 The claims against Good Samaritan Hospital Medical Center were voluntarily dismissed on September 24, 2004. The district court subsequently dismissed the two "Doe doctor" defendants after discovery failed to identify themColavito, 356 F.Supp.2d at 238 n. 1.
 
 
 [8]
 Colavito did not move for summary judgment with respect to his fraud claim
 
 
 [9]
 In an attempt to rebut this argument, Colavito submitted a CNN.com article reporting that an eBay auction of a "fully functioning kidney" received bids of more than $5.7 million
 
 
 [10]
 Because the plaintiff's request for punitive damages indisputably clears the jurisdictional threshold, we need not resolve at this juncture whether, at the time of filing, Colavito had a good-faith claim that he was deprived of a functioning and compatible kidneySee Zacharia v. Harbor Island Spa, Inc., 684 F.2d 199, 202 (2d Cir.1982).
 
 
 [11]
 It is also difficult to ignore the fact that by diverting a kidney that was in all likelihood of no use to him, another life was apparently spared
 
 
 [12]
 We are, of course, not applying "general federal common law" in this case,see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), but we find it interesting that most federal case law seems to be contrary to the district court's position. As the plaintiffs point out, both the Sixth and Ninth Circuit's have recognized that a state-law right to prevent mutilating or removing organs from a decedent's body can constitute a property interest under the Due Process Clause of the Fourteenth Amendment. The Sixth Circuit reasoned:
 [T]he Uniform Anatomical Gift Act governing gifts of organs and tissues for research or transplant, expressly grants a right to Deborah Brotherton to control the disposal of Steven Brotherton's body. . . . Although extremely regulated, in sum, these rights form a substantial interest in the dead body, regardless of Ohio's classification of that interest. We hold the aggregate of rights granted by the state of Ohio to Deborah Brotherton rises to the level of a "legitimate claim of entitlement" in Steven Brotherton's body, including his corneas, protected by the [D]ue [P]rocess [C]lause of the [F]ourteenth [A]mendment.
 Brotherton v. Cleveland, 923 F.2d 477, 482 (6th Cir.1991); accord Newman, 287 F.3d at 797 ("Nor does the fact that California forbids the trade of body parts for profit mean that next of kin lack a property interest in them."). Similarly, when the Supreme Court has defined property in the takings context, it has emphasized: "We have never held that a physical item is not `property' simply because it lacks a positive economic or market value." Phillips v. Wash. Legal Found., 524 U.S. 156, 169, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).
 
 
 [13]
 Compare Brotherton, 923 F.2d at 483 (Joiner, J., dissenting) (arguing that Uniform Anatomical Gift Act is "designed to use new scientific knowledge to enable body parts of a deceased to bring sight and health to the living disabled, and thus to society as a whole" and that it "state[s] a straightforward policy in favor of helping those who live"), with Perry, 886 F.Supp. at 1559 ("The knowing misrepresentation of information needed to make a thoughtful and deliberate decision to donate is not conduct on the part of a hospital that publicly encourages the making of anatomical gifts or that protects and balances the conflicting interests consistent with the prevailing customs and desires in this country.") (internal quotation marks and citation omitted).
 
 
 [14]
 We disagree with the district court's statement that even if a donor has enforceable rights, an intended donee would not have standing to enforce themSee Colavito, 356 F.Supp.2d at 246. If New York Public Health Laws do provide donors with enforceable rights, we see no reason why those rights could not also be enforced by intended third-party beneficiaries. "New York follows the nearly universal rule that a third person may, in his own right and name, enforce a promise made for his benefit even though he is a stranger both to the contract and to the consideration. . . . [T]here is need for neither consideration from, nor privity with, nor obligation to, the third person." N.Y. Jur. Contracts § 302. The New York Court of Appeals has adopted the Restatement's distinction between intended and incidental beneficiaries and explained that "[e]ssential to status as an intended beneficiary . . . is either that `performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary' or that `the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'" Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38, 44, 485 N.E.2d 208, 212, 495 N.Y.S.2d 1, 5 (1985) (quoting Restatement (Second) of Contracts § 302(2)). It seems clear that the consent form directing a donation to Colavito would meet this standard.
 
 
 [15]
 Our dissenting colleague asserts that certification is unnecessary because "this appeal can be resolved fairly easily on narrow and uncontroversial grounds." Whether or not the dissent's grounds are narrow, they hardly seem to us to be uncontroversial
 The dissent first argues that because the statute authorizes transplants of organs that are "needed," it does not permit transplants on the basis of "contingent or future need." [DJ ____]. As an initial matter, it is not readily apparent to us how the fact that the statute authorizes donations for patients who "need" an organ can constitute plain language that "contingent need" is categorically forbidden. Even if we found this statutory interpretation to be persuasive, we doubt that we are the appropriate tribunal to adopt it, especially without an interpretation by a New York court on which to rely. Protecting hospitals, donor networks and persons in need from being "drawn into macabre transactions and litigations," [DJ ____], is precisely the type of policy choice that we think should be made by the New York legislature and courts.
 The fact that the hand-written word "KIDNEY" appears on the donor form is similarly not a narrow ground upon which we think that this dispute can resolved. We find fault with the dissent's approach for several reasons. First, there is no indication on the donor form that it is a fully integrated document. Parol evidence can therefore be used to establish whether Debra Lucia intended to direct one or two kidneys. See, e.g., Laham v. Chambi, 299 A.D.2d 151, 753 N.Y.S.2d 34 (1st Dep't 2002). Second, Hertzel, a NYODN representative and individual defendant, was the person who wrote in the word "KIDNEY." Even if third parties, such as a hospital or an outside doctor, could in good faith think the form directed only one kidney to Colavito, the NYODN in general and Hertzel in particular had actual knowledge of the actual terms of the donation. Finally, even if the form could be read to direct only one kidney to Colavito, there is no indication that the second kidney was given to the organ donor pool. The only form that Debra Lucia signed was marked as a directed donation for Colavito. If the second kidney was indeed not covered by that form, we see no authority for NYODN to take it, any more than it could take, without authority, another of his organs.
 
 
 [16]
 Section 4351(7) also incorporates by reference section 4306's good faith immunity provision and states that violators will be held responsible only "to the extent permissible under such subdivision." The combined literal meaning seems to be that negligent persons will be held legally responsible to the extent permissible under a provision which shields negligent persons from liability. This would be, of course, a very odd provision. There may be a number of ways to reconcile the two sections. "Good faith" might include some, but not all, acts of negligence. Or perhaps a court could reason that section 4351(7) makes negligent parties legally responsible for injunctive relief, but sections 4306(3) shields them from personal liability
 
 
 [17]
 Because we are certifying questions to the New York Court of Appeals, we need not—and do not—reach Colavito's claim that the district court improperly considered expert testimony that did not comply with Federal Rule of Civil Procedure 26(a)(2)
 
 
 
 88
 DENNIS JACOBS, dissenting.
 
 
 89
 I respectfully dissent from the majority opinion insofar as it certifies questions to the New York Court of Appeals.
 
 
 90
 The majority opinion poses several portentous questions to the New York Court of Appeals: whether New York law provides the donee of a directed organ donation with rights that can be vindicated in a lawsuit; whether such a donee may recovery nominal or punitive damages; whether New York law immunizes either negligent or grossly negligent misconduct by the administrators of organ donation programs. I am curious to know the answer to these questions, but the answers are not really helpful to the resolution of this appeal, given the facts presented.
 
 
 91
 In a nutshell, Mrs. Lucia signed a consent for the removal of both kidneys from her husband's body, and designated Colavito as donee of "KIDNEY" (singular); one kidney was rushed from New York to Colavito in Florida, but it had a defect and could not be implanted; the second kidney stayed in New York and had already been routed to another person who needed it; the only medical evidence is that neither kidney was compatible with Colavito's tissues; other kidneys offered to Colavito have likewise been incompatible; the widow has testified in deposition that she intended and thought that both kidneys would go to Colavito.
 
 
 92
 The district court adopted a somewhat broad holding that a directed donee may not bring a tort action or a private right of action under the New York anatomical gift statute for the misdirection of an organ needed by the donee. But in my view, this appeal can be resolved fairly easily on narrow and uncontroversial grounds that would implicate no important, influential or unsettled issue of public policy.
 
 
 93
 We need only decide whether Colavito—whose medical condition puts him in need of one kidney—had an entitlement to both of them. As the majority opinion observes, no one needs more than one kidney. A plain reading of the New York anatomical gift statute confirms that no donee in need of a kidney can have an entitlement to get two of them at the same time, and that no one can assert any claim at all if the process is conducted without negligence and in good faith. A reading of the consent form confirms that Colavito had no basis for claiming both kidneys.
 
 
 94
 * The statute specifies who may execute an anatomical gift, who may become the recipient of an anatomical gift, and how such gifts are to be executed. As the majority opinion states, the only quasi-proprietary interest in a human organ is set out and bounded by statute. The statute allows directed donations, but limits the donations on the basis of what is needed:
 
 
 95
 The following persons may become donees of gifts or bodies or parts thereof for the purposes stated: . . .
 
 
 96
 (4) any specified donee, for . . . transplantation needed by him.
 
 
 97
 § 4302(4) (emphasis added). Thus New York does not allow an organ to be donated to anyone who wants it—to sell it or hoard it; or to pass it along to someone else who needs it; or to allow for a contingent or future need, as (for example) as a backup or spare in case one kidney is damaged or lost in transport, or is defective, or is rejected. Otherwise, hospitals, donor networks and persons in need would be drawn into macabre transactions and litigations. I would therefore affirm (without certifying any question) on the ground that as a matter of law Colavito could have no entitlement to receive two kidneys at the same time. (Colavito does not dwell on what would have happened to the second kidney if the first sufficed; but given the two-day shelf-life on ice, and the shipment to Florida, it is clear enough that it would have been thrown away.)
 
 B
 
 98
 The consent form signed by Mrs. Lucia indicates: (1) that the gift of both kidneys was made to the New York Organ Donor Network; that the Donor Network was authorized to use the gift "in accordance with medical and ethical standards"; (3) that she directed "KIDNEY"—singular—to Colavito; and (4) that if the directed donee could not use the gift—"for medical or logistical reasons"—the Donor Network could allocate the organs as if no direction had been made. Colavito says that the singular "KIDNEY" is an error; but he is thus seeking to ignore the text authorizing the gift and instead decide his entitlement on the basis of what Mrs. Lucia said later in a deposition about her (untenable) understanding of the form that she signed. Colavito points out that widow was grief-stricken, and contends that the Donor Network took advantage of her. But this proves too much: It may be expected that every next-of-kin who signs such a consent is vulnerable; yet a rule that treats such a consent as a suspect contract of adhesion would of course frustrate the whole project of medical transplants.
 
 
 99
 Mrs. Lucia now says that her thought and intent was for both kidneys to go to Colavito, and that she would not have consented to the removal of the second kidney to save the life of anyone else. The New York anatomical gift statute respects the interests of the next-of-kin (as well as the interests of those in medical need); but it also protects the administrators of organ donation programs so that they can make urgent life-saving decisions that will be lawful so long as they act without negligence and in good faith. See Art. 43, § 4306(3). That provision is ineffective if courts second-guess these decisions, at least in the absence of an allegation that the donor network acted negligently or in bad faith to divert elsewhere an organ that was needed by the named donee. The decisive facts here are that the Donor Network sent Colavito the single kidney that he needed, and sent the other to another person who needed it to live. The one sent to Colavito turned out to be defective (or incompatible, or whatever); but that problem is not attacked as negligence, and does not impugn the good faith of administrators who were trying to maximize the life-giving benefits of the donated organs—these things do not come with warranties express or implied.
 
 
 100
 I would therefore affirm (without certifying any question) on the additional ground that (even if the statute affords a right of action to donees) Colavito suffered from no violation of the New York anatomical gift statute because there is no sustainable allegation of bad faith or negligence, because he received the only thing for which he could be a donee under the statute (a single kidney), and because there is no misdirection as a matter of law where the disposition of the donated organs accords with the arrangements set out in the organ donor form.
 
 C
 
 101
 The certification of questions is therefore unnecessary because oddball facts of this appeal (among other things, the kidneys at issue were incompatible with Colavito's system) present no large questions, are controlled by the plain wording of the statute and the consent form, and do not justify the time and expense of certification. At the same time, I concede that there are delays and expenses whenever a question is certified; and of course the Court of Appeals is free to answer the certified questions or not, and any answers given will be instructive (and doubtless useful in other cases). Moreover, this case would be decided if the Court of Appeals ruled that donees have no right of action under the statute (though that question probably should await a case that poses it, such as one in which an organ is negligently mislaid or corruptly diverted).
 
 
 102
 So why do I bother to dissent from the certification of questions?
 
 
 103
 The trouble with certification in this case is that the manifest intent of the statute is to protect the organ donation systems from coils of unnecessary litigation. Lawyers love to issue rulings on medical ethics (though they do not solicit advice on legal ethics from doctors), and are naturally drawn to large questions. But this Court owes a prompt decision on an easy appeal, particularly in this area, where litigation and the threat of it may choke an organ donation system that works well, and cause it to become (successively) inhibited, intimidated, over-law-yered, paralyzed and beggared.