Robert COLAVITO, Plaintiff,

v.

NEW YORK ORGAN DONOR NETWORK, INC., Robert Kochik, Spencer Hertzel, Dr. Doe I, M.D., and Dr. Doe II, M.D., Defendants.

No. 03–CV–4187(DLI).

United States District Court,
E.D. New York.

Feb. 15, 2005.

Victor M. Serby, Victor M. Serby, Esq., Woodmere, NY, for Plaintiff.

Richard E. Lerner, Robin Nemia, Wilson, Elser, Moskowitz, Edleman & Dicker, LLP, Peter R. Bower, Bower, Sanger & Lawrence, P.C., New York City, for Defendants.

## OPINION AND ORDER

IRIZARRY, District Judge.

This lawsuit raises certain legal issues of first impression. It arises out of an organ donation made by Debra Lucia to plaintiff Robert Colavito upon the death of her husband, Peter Lucia. Based on the alleged misdirection of one of the kidneys intended for him, plaintiff seeks damages against the New York Organ Donor Network ("NYODN"), its Director of Clinical Operation, Robert Kochik, and Spencer Hertzel, who assisted Mrs. Lucia in coordinating the organ donation.[1] Plaintiff claims fraud, conversion, and violation of N.Y. Public Health Law Articles 43 and 43-A. For the following reasons, the court grants summary judgment in favor of defendants on all claims and denies plaintiff's cross-motion for summary judgment.

## I. FACTS

Mr. Colavito, a longtime friend of Peter Lucia, has been suffering from End Stage Renal Disease, for which he has been receiving dialysis treatment and on a kidney transplant waiting list. On August 21, 2002, doctors tentatively determined Peter Lucia to be brain dead, after he suffered a massive intra-cranial bleed, and pronounced him dead the following morning.

Sometime during the morning of August 22, 2002,[2] Mrs. Lucia asked a nurse at the Good Samaritan Hospital[3] about the possibility of donating her husband's kidneys to Mr. Colavito. Mrs. Lucia then spoke to defendant Spencer Hertzel, a transplant coordinator, who asked Mrs. Lucia questions about her husband's medical history. At her deposition, Mrs. Lucia also recalled discussing the organ donation with an unidentified woman at the hospital. Although she originally wanted to donate one kidney, after discussing the procedure with

---

1. The complaint also names two "Doe" doctors. However, since discovery has been completed and these individuals have not been identified, the complaint against them is dismissed.

2. At her deposition, Mrs. Lucia stated that she knew at this point in time that her husband was brain dead, but she did not remember whether he had been pronounced dead by the doctors, which the Certificate of Death records at 10:40 a.m.

3. The hospital, originally named as a co-defendant, was discontinued by stipulation on September 24, 2004.

the woman, she decided to have both kidneys taken out together as a block. Mrs. Lucia testified that she did not authorize the kidneys to be used for medical research and had made it clear to Mr. Hertzel that both kidneys were intended for Mr. Colavito: "I just wanted to be assured that [the] kidneys were going to just go to Bobby [Mr. Colavito].... They were not for anyone else and I told him [Mr. Hertzel] that specifically."[4] (Debra Lucia Dep. at 38.)

Mrs. Lucia signed a consent form from the NYODN, which she acknowledges having read. On the consent form, Mrs. Lucia checked "Yes" for "Directed Donation" and specified "Kidney" as the "Organ/tissue to be directed" to Mr. Colavito, a "Friend." Below the lines for directed donation, the form states: "If it is not feasible for medical or logistical reasons for the donated organs/tissue to be used by the person to whom I direct it, the NYODN may allocate the organs/tissue as if I had not made a directed donation" (alterations in original). Mrs. Lucia testified that when she signed this form, she understood from Mr. Hertzel that the kidneys were transplantable and compatible

with Mr. Colavito and that her husband had type O negative blood, the universal blood type. According to Mrs. Lucia, Mr. Hertzel told her son: "They [the kidneys] are not a perfect match, but they are good enough." (Debra Lucia Dep. at 63;see also Peter Lucia Decl. ¶ 50.) Mrs. Lucia stated that her main concern was for Mr. Colavito to receive a functioning kidney, but she acknowledged that the other kidney could be given to someone else as long as Mr. Colavito's transplant was a success.[5] (Debra Lucia Dep. at 64–65.)

On the morning of August 23, 2002, plaintiff Robert Colavito reported to Jackson Memorial Hospital in Miami. At the hospital, Mr. Colavito signed several consent forms and was fully prepared for surgery, which included the administration of intravenous fluid. He was then told by Dr. George Burke,[6] Director of Kidney–Pancreas Transplantation at the University of Miami, who was called in to assess suitability for transplant, that only one kidney had been received and that an aneurysm found in the renal artery rendered it unfit for transplant. Mr. Colavito claims Robert Kochik, Director of Clinical Operation at NYODN, told him that the

4. Mrs. Lucia states that Mr. Hertzel's notes on the "Donor Family Assessment/Case Report," indicating her consent to donate the second kidney to "the pool," are false. (Debra Lucia Decl. ¶ 26.)

5. In contrast, Mrs. Lucia's son, Peter M. Lucia, stated: "At no time did my mother ever consent to have my father's kidneys, associated tissue or other organs or tissues gifted to Defendant, NEW YORK ORGAN DONOR NETWORK, INC. for allocation to recipients determined by it." (Peter Lucia Decl. ¶ 18.) He further stated: "My mother, Debra Lucia, never made a second consent to donate my father's kidney to 'the pool,' as referenced in [the Donor Family Assessment/Case Report, signed by Mr. Hertzel]." (Id. ¶ 27.) He also stated: "My mother, Debra Lucia, in my presence, informed Defendant, SPENCER HERTZEL ... of her intent that both kidneys and

the associated kidney tissue were to be sent to Plaintiff, ROBERT COLAVITO's transplant surgeon in Florida intact, just as the 2–kidney block was recovered from my father." (Id. ¶ 42.)

6. To the extent plaintiff argues that Dr. Burke's testimony should be excluded because no expert report was provided pursuant to Fed.R.Civ.P. 26(a)(2), the court notes that Dr. Burke is not an expert witness. Dr. Burke was not retained to testify for the purposes of trial. Rather, his deposition relates to how he assessed that the kidney gifted to Mr. Colavito was non-transplantable, and this does not make him an expert. See DeRienzo v. Metropolitan Transit Auth., 2004 WL 67479, at *2 (S.D.N.Y.2004) (doctor who testifies as to "facts learned and opinions formed in the course of treatment" is not an expert for purposes of Rule 26).

second kidney had been allocated to someone else around the same time that the first kidney was sent to Florida and that it had been successfully transplanted. In view of this situation, Mr. Kochik offered to put Mr. Colavito at the top of the NYODN kidney donation list.

In addition to the aneurysm problem, defendants assert that the kidney was not a match for Mr. Colavito. Plaintiff does not outright dispute this but instead argues that incompatibility has no bearing on the fact that defendants misappropriated the second kidney that was gifted to him. Plaintiff also characterizes the incompatibility determination as belated and suspect. Mr. Colavito claims he first heard about an incompatibility problem about a month after Mr. Lucia's death. Mrs. Lucia claims she did not hear of any compatibility problem until she received a letter from Mr. Kochik, dated October 16, 2002, on behalf of NYODN, stating: "The cross-match between Mr. Colavito and your husband's kidneys was incompatible as well. This means he could not have accepted either of your husband's kidneys." Dr. Burke testified that he learned of the incompatibility (positive B and T cell cross-matches) around twelve hours after he discovered the aneurysm.

## II. AMOUNT IN CONTROVERSY

■ Defendants argue that plaintiff has not met the $75,000 amount in controversy requirement, pursuant to 28 U.S.C. § 1332(a), because kidneys cannot be given an economic value. Defendants attempt to support this argument by citing N.Y. Public Health Law § 4307, which prohibits the sale of human organs. The amount in

controversy alleged in the complaint is considered presumptively correct, and a defendant has a high bar to overcome in challenging the amount. *Scherer v. Equitable Life Assurance Soc'y*, 347 F.3d 394, 397 (2d Cir.2003). Indeed, the defendants would have to show " 'to a legal certainty' that the amount recoverable does not meet the jurisdictional threshold." *Id.* In determining whether plaintiff has met the amount in controversy requirement, the court may aggregate plaintiff's claims. *See Wolde Meskel v. Vocational Instruction Project Cmty. Services, Inc.*, 166 F.3d 59, 62 (2d Cir.1999).

Without deciding whether defendants' argument as to § 4307 is persuasive, which would engage the court in an ethical debate, the court finds that plaintiff's fraud claim is enough to satisfy the amount in controversy. Plaintiff claims that, as a result of defendants' actions, he continues to suffer from End Stage Renal Disease and remains on dialysis. On his fraud claim, plaintiff seeks $10 million in unspecified damages [7] and $30 million in punitive damages. Punitive damages are only available for fraud claims where the fraud alleged "is gross and involves high moral culpability." *Shanahan v. Vallat*, 2004 WL 2937805, at *11 (S.D.N.Y.2004) (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497 (1961)). On the face of the complaint, plaintiff's allegations concerning the alleged purposeful misdirection of an organ donation are sufficient for meeting this standard. The court cannot say to a legal certainty that plaintiff has not met his jurisdictional burden. Therefore, the

---

7. To the extent that plaintiff seeks pain and suffering damages, such damages are not allowed for fraud claims. *See Weissman v. Dow Corning Corp.*, 892 F.Supp. 510, 515 (S.D.N.Y.1995). The court presumes that, as to at least part of the $10 million, plaintiff seeks compensatory damages for medical treatment. However, it is not necessary to break down this number, because, in the very least, plaintiff satisfies the amount in controversy with his demand for punitive damages.

court finds plaintiff's complaint sufficient with respect to amount in controversy.

## III. FRAUD

■ To establish a claim for fraud, plaintiff must show that (1) the defendants misrepresented a material fact; (2) the defendants knew they were making a false misrepresentation; (3) Mr. Colavito justifiably relied on such misrepresentation; and (4) he suffered harm as a result. *See Cohen v. Houseconnect Realty Corp.*, 289 A.D.2d 277, 734 N.Y.S.2d 205, 206 (2d Dep't 2001). Plaintiff claims that defendants NYODN and Mr. Hertzel intentionally misrepresented to plaintiff that both kidneys would be sent to him when in fact they intended to divert the second kidney to another recipient. Plaintiff claims that he relied on this misrepresentation and that it was the defendants' actions that proximately caused him loss of a transplantable kidney. Unfortunately, the court is unable to afford relief under this theory.

The problem with plaintiff's analysis is the issue of causation, which is central to assessing fraud:

> Reliance is to fraud what proximate cause is to negligence; that is to say, without reliance, there can be no recovery for fraud. It is not necessary for the representation to have been the exclusive cause of plaintiff's action or nonaction; it is sufficient that but for the representation plaintiff would not have acted or refrained from acting, that is, that the representation was a substantial factor in inducing plaintiff to act or refrain from acting.

*In re Fifth Judicial Dist. Asbestos Litigation*, 6 Misc.3d 176, 784 N.Y.S.2d 829, 833 (2004) (quoting N.Y. Pattern Jury Instructions 3:20 [Intentional Torts, Fraud and Deceit] (West 2004)) (internal citations omitted). In further explanation: "Causation, in relation to losses incurred by reason of a misrepresentation, is a matter of the recipient's reliance in fact upon the misrepresentation *in taking some action or in refraining from it.*" RESTATEMENT (SECOND) OF TORTS § 548A cmt. a (1977) (emphasis added). Therefore, to succeed on a claim for fraud, there must be some *action* the plaintiff took *because of* the defendants' alleged misrepresentations that *caused* him harm.

The sole actions that plaintiff claims to have taken because of the alleged misrepresentations are going to the hospital and preparing for surgery. But the actions Mr. Colavito took are not what left him without a kidney, which is the harm he alleges. True, in the light most favorable to the plaintiff, but for the defendants' alleged actions, plaintiff might have received a transplantable kidney—leaving the issue of compatibility aside. But plaintiff cannot sustain a claim for fraud without showing how his justifiable *reliance* on the defendants' alleged misrepresentations *caused* him harm.[8] Summary judgment is accordingly granted in favor of defendants on this claim.

## IV. CONVERSION

■ Plaintiff argues that, upon Mrs. Lucia's directed organ donation, the kidneys became his property, unconditionally and irrevocably. Plaintiff further argues

---

**8.** The lack of harm here is underscored by the fact that, subsequently, seven other possible transplants brought to Mr. Colavito's attention did not materialize. Indeed, because Mr. Colavito was unable to receive either of the Mr. Lucia's donated kidneys, NYODN placed him at the top of the donation recipient list.

Both sides confirmed that Mr. Colavito has since been offered seven kidneys for transplantation without success. Two were found to be diseased, and the other five were found to be incompatible. Apparently, Mr. Colavito has a high level of antibodies, which makes finding a compatible kidney match difficult.

that the defendants' actions constitute conversion because they intentionally and wrongfully acquired the second kidney when they misdirected it to another transplant recipient. To support a claim for conversion, "a plaintiff must establish legal ownership of a specific identifiable piece of property and the defendant's exercise of dominion over or interference with the property in defiance of the plaintiff's rights." *Ahles v. Aztec Enterprises, Inc.,* 120 A.D.2d 903, 502 N.Y.S.2d 821, 822 (3d Dep't 1986).

The issue of whether a specified donee of an anatomical gift may sustain a claim for conversion is an issue of first impression. The court has found no cases involving similar facts in either this or any other federal circuit or state court. However, courts have disallowed conversion claims in other cases involving the body of a deceased. *See, e.g., Shults v. United States,* 995 F.Supp. 1270, 1275–76 (D.Kan.1998) (parents of deceased airman had no claim for conversion where portions of son's tissues and organs were discarded after autopsy); *Hasselbach v. Mt. Sinai Hosp.,* 173 A.D. 89, 159 N.Y.S. 376, 377, 379 (1st Dep't 1916) (widow could not sustain conversion claim for unauthorized autopsy performed on husband). The court, therefore, takes guidance from other cases addressing the parameters of the property rights, if any, that attach in the disposition of a body at death.

In examining this question, the court delves into an area not easily transferable to general concepts of law:

Death is unique. It is unlike aught else in its certainty and its incidents. A corpse in some respects is the strangest thing on earth. A man who but yesterday breathed and thought and walked among us has passed away. Something has gone. The body is left still and cold, and is all that is visible to mortal eye of the man we knew. Around it cling love and memory. Beyond it may reach hope. It must be laid away. And the law—that rule of action which touches all human things—must touch also this thing of death. It is not surprising that the law relating to this mystery of what death leaves behind cannot be precisely brought within the letter of all the rules regarding corn, lumber and pig iron.

*Louisville & N.R. Co. v. Wilson,* 123 Ga. 62, 51 S.E. 24, 25 (1905); *see also Perry v. Saint Francis Hosp. & Med. Ctr., Inc.,* 886 F.Supp. 1551, 1553 (D.Kan.1995). Indeed, New York courts have long recognized that a dead body was not property at common law. *See, e.g., Correa v. Maimonides Med. Ctr.,* 165 Misc.2d 614, 629 N.Y.S.2d 673, 675 (1995); *Cercelli v. Wein,* 60 Misc.2d 345, 303 N.Y.S.2d 316, 318 (1969); *In re Donn,* 14 N.Y.S. 189 (1891). Courts have thus not applied traditional, all-encompassing conceptions of property to cases involving a deceased's body or organs. However, the courts have considered modified or "quasi" property rights in several scenarios, which are relevant in explaining the court's reasoning in the instant matter.

For example, an individual has a right to direct the disposition of his or her body at death, but such disposition "forms no part of the 'property' of one's estate in the usual sense, as other chattels or property." *In re Estate of Moyer,* 577 P.2d 108, 110 (Utah 1978). In the *Moyer* case, the Supreme Court of Utah denied a mother's request to exhume her adult son to be cremated, ten months after his death, even though the son's executor had buried him against his wishes. *Id.* at 109, 111. Although an individual's instructions regarding disposition of his or her body after death should be respected, the court reasoned:

[B]ecause of the involvement of the public interest and the rights and responsi-

bilities of survivors, this is a property right of a special nature; and we do not desire to be understood as saying that this right should be regarded as an absolute property right by which a person could give absurd or preposterous directions that would require extravagant waste of useful property or resources, or be offensive to the normal sensibilities of society in respect for the dead.

*Id.* at 110.

As to other individuals, the courts in both New York and other states generally recognize a "quasi-property" right, belonging to the spouse or next of kin to possess the body for the purposes of ensuring proper burial. *See, e.g., Bauer v. North Fulton Med. Ctr.,* 241 Ga.App. 568, 527 S.E.2d 240, 243 (1999); *Dick v. City of New York,* 2002 WL 31844745, at *2 (2002); *Moyer,* 577 P.2d at 110 n. 5. "The quasi-property right in a corpse is not pecuniary in nature, nor should it be. The right encompasses only the power to ensure that the corpse is orderly handled and laid to rest, nothing more." *Bauer,* 527 S.E.2d at 244. It is also important to note that the use of the word "property" is for convenience rather than for assignment of broad rights:

> In most [cases involving the mishandling of dead bodies], the courts have talked of a somewhat dubious "property right" to the body, usually in the next of kin, which did not exist while the decedent was living, cannot be conveyed, can be used only for the one purpose of burial, and not only has no pecuniary value but is a source of liability for funeral expenses. It seems reasonably obvious that such "property" is something evolved out of thin air to meet the occasion, and that it is in reality the personal feelings of the survivors which are being protected, under a fiction likely to deceive no one but a lawyer.

*Id.* (quoting PROSSER, THE LAW OF TORTS 58–59 (4th ed.1971)).

This quasi-property right is also a foundation for a close relative's claim of negligent mishandling of a corpse, for which emotional damages are recoverable. *See, e.g., Bd. of Regents of the Univ. Sys. of Georgia v. Oglesby,* 264 Ga.App. 602, 591 S.E.2d 417, 422 (2003); *Johnson v. State,* 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590, 592 (1975).

Even where courts have used the phrase "property interest" rather than "quasi-property right" to describe rights in a deceased's body parts, these interests belong only to the next of kin. For example, the Sixth Circuit in *Whaley v. County of Tuscola* held that next of kin relatives could bring a § 1983 claim against state actors who violated their procedural due process rights by removing the eyes and corneas of the deceased without authorization. 58 F.3d 1111, 1113–14 (6th Cir.1995). The court held that the next of kin's "right to dispose of the body in limited circumstances, possess the body for burial, and prevent its mutilation" created a property interest protected by the Constitution, which it deemed a "legitimate claim of entitlement." *Id.* at 1116–17.

Courts have also been reluctant to apply contract law to organ donations. For example, in *Perry,* a Kansas district court held that plaintiffs could not claim breach of contract based on the removal of more body parts from the deceased than were authorized on the organ donation form. *See* 886 F.Supp. at 1563. The court based its decision on the limit of the spouse's quasi-property right, which only extends to preserving and burying the body. *See id.* The court further explained: "Because society accepts the exchange of human body parts only when based on a gift model, courts should be reluctant to recognize a

cause of action that contravenes this fundamental public philosophy." *Id.* at 1564.

It is for similar reasons that, in the present case, the court cannot allow plaintiff's conversion claim to go forward. Several courts, including a New York State appellate court, that have considered a claim for conversion in cases involving an unauthorized organ removal or other interference with the body of a deceased have concluded that it is not sustainable. *See, e.g., Shults,* 995 F.Supp. at 1275–76; *Bauer,* 527 S.E.2d at 244 (widow could not maintain a claim for conversion based on the unauthorized removal of her husband's eye tissue); *Hasselbach,* 159 N.Y.S. at 377, 379. *But see Wint v. Alabama Eye & Tissue Bank,* 675 So.2d 383, 384–86 (Ala. 1996) (plaintiff-spouse made prima facie showing for conversion where deceased's eyes were donated without authorization, but claim not supported by substantial evidence); *Spates v. Dameron Hosp. Ass'n,* 114 Cal.App.4th 208, 7 Cal.Rptr.3d 597, 607–09 (2003) (conversion claim founded on mother's quasi-property right in deceased daughter's body permissible, but intent to exercise ownership not shown where defendant-hospital transported body to coroner after mother could not be reached).[9] This court agrees with the Georgia Court of Appeals in *Bauer* that it would be against public policy to engage in a valuation of Mr. Colavito's kidneys, which are not property.[10] *See* 527 S.E.2d at 244. Based on the case law discussed above, the court also finds it inappropriate to expand the limited right that courts recognize in a deceased's body, which only belongs to the next of kin to ensure proper burial. Summary judgment is granted in favor of defendants on this claim.

**9.** These cases are nevertheless distinguishable with the instant case because the courts only permitted the next of kin to sustain a claim for conversion.

## V. VIOLATION OF NEW YORK ANATOMICAL GIFT LAWS

Plaintiff alleges violation of N.Y. Public Health Law Article 43, this state's codification of the Uniform Anatomical Gift Act, and Article 43–A, which delineates the duties of hospital administrators, organ procurement organizations, and eye and tissue banks.

### A. *N.Y. Public Health Law Article 43*

■ Plaintiff claims that defendants willfully disregarded Mrs. Lucia's directed organ donation, as provided by N.Y. Public Health Law § 4302(4) ("any specific donee, for therapy or transplantation needed by him," may become a donee) and § 4303(3) (stating that an anatomical gift may be made to a specified donee). It is an issue of first impression whether plaintiff, a donee, has standing to sue under Article 43 of the N.Y. Public Health Law.

In interpreting a statute, the court's first step is to look at the plain meaning of the statute. *Disabled in Action of Metro. New York v. Hammons,* 202 F.3d 110, 119 (2d Cir.2000).

> [The court's] inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.... The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.

*Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). N.Y. Public Health Law Article 43, which includes the sections plaintiff cites, provides no instruction as to standing. Furthermore, nowhere does the stat-

**10.** To the extent that plaintiff offers a bailment theory, this too must fail. Damages available on such a theory are only for diminished property value, and, as discussed, such valuation is inappropriate with respect to organ donations. *See Bauer,* 527 S.E.2d at 244.

ute confer specific or detailed rights to donees.

Section 4301(5) gives the court some pause, where rights of donees are mentioned but not explained: "The rights of the donee created by the gift are paramount to the rights of others except as provided by [§ 4308]."[11] There are several references to donees throughout the statute, but the court finds it unclear what "rights," if any, are established. Section 4301 provides that the donee shall not accept an anatomical gift if there is "actual notice of contrary indication by the decedent," if the gift is "contrary to the decedent's religious or moral beliefs," or if the donation was not properly authorized. Section 4302 lists who may become a donee, and § 4303 covers some procedures relating to gifts to a specified donee. Section 4304 states that delivery of the gift card to a specified donee is not necessary for a valid gift. Pursuant to § 4306, the last section where donees are mentioned:

> The donee may accept or reject the gift. If the donee accepts a gift of the entire body, he may, subject to the terms of the gift, authorize embalming and the use of the body in funeral services. If the gift is of a part of the body, the donee upon the death of the donor and prior to embalming, may cause the part to be removed without unnecessary mutilation.

In the context of the statute as a whole, therefore, "[t]he rights of the donee" mentioned in § 4301(5) are not readily discernible. Indeed, rather than conferring rights to the donee, the statute's main emphasis is on the donee's role in accepting a gift in accordance with the donor's intention.

To resolve this ambiguity, the court looks next to the background and legislative history of the statute: "[W]here the scope of a statutory provision is not made crystal clear by the language of the provision, it is appropriate to turn to the legislative history of the statute." *In re Palm Coast, Matanza Shores Ltd. P'ship,* 101 F.3d 253, 257 (2d Cir.1996) (quoting *Berger v. Heckler,* 771 F.2d 1556, 1571 (2d Cir. 1985)).

The purpose of the Uniform Anatomical Gift Act of 1968[12] was to encourage organ donation, to eliminate uncertainty as to the applicable law where the place of death and residency of the donor or recipient of the gift may differ, and to balance conflicting interests while respecting the deceased. UNIF. ANATOMICAL GIFT ACT (1968) Prefatory Note, 8 U.L.A. 71. The interests to be balanced are:

> (1) the wishes of the deceased during his lifetime concerning the disposition of his body; (2) the desires of the surviving spouse or next of kin; (3) the interest of the state in determining by autopsy, the cause of death in cases involving crime or violence; (4) the need of autopsy to determine the cause of death when private legal rights are dependent upon such cause; and (5) the need of society for bodies, tissues and organs for medical education, research, therapy and transplantation.

*Id.* at 70. All fifty states have adopted either the 1968 or the 1987 Uniform Anatomical Gift Act in some form.

New York enacted its version of the Uniform Anatomical Gift Act of 1968 in 1970. In a memorandum of support to the Governor's office, Assemblyman Francis P.

---

**11.** Section 4308 prohibits any physician, hospital, or other health care provider from charging a fee to the donor's estate.

**12.** This Act has been superseded by the Uniform Anatomical Gift Act of 1987, which New York has not adopted. However, the prefatory notes to the two acts express similar purposes.

McCloskey, who introduced the bill, cites the increased use of body parts for transplants and medical science as a reason for the legislation. This memorandum also stresses the interests of parties involved: "The present state of the law of the State of New York leaves doubts as to the rights of the family and the liabilities of physicians and institutions which require resolution. . . . This bill has been carefully drawn to protect the interests of the deceased and those closest to him." Memorandum of Support, *attached to* Letter from Francis P. McCloskey, N.Y. State Assemblyman, to Hon. Robert R. Douglass, Counsel to the Governor (Apr. 30, 1970).

In 1994, the New York State Senate amended N.Y. Public Health Law Article 43, in part, by adding to § 4301 the language that the donee should not accept a donation that is unauthorized or otherwise contrary to anatomical gift procedures. 1994 N.Y. Laws, ch. 62, § 1. The purpose of this legislation was to ensure "the primacy of a decedent's wishes in making anatomical gifts," specifically, "[t]o make organ and tissue procurement more efficient by reaffirming the primacy of the intentions of the person donating and by clarifying the right of those who donate on behalf of the deceased." New York State Senate, Introducer's Memorandum in Support, S.4528B.

In reading N.Y. Public Health Law Article 43, the above purposes—encouraging and facilitating organ donation and protecting the donor's and/or next of kin's wishes—prevail. For example, § 4301 requires donors to be at least eighteen years of age and specifies which individuals, by order of priority, may consent to donation on behalf of the deceased. Section 4301 also prohibits a donee from accepting an anatomical gift where the donee knows that it would be contrary to the decedent's wishes or in violation of organ donation procedures. Section 4302 lists who may become a donee and for which reasons. For example, a hospital may use donated organs for medical research, and a storage facility or specified donee may become a donee for transplantation purposes. Section 4303 describes the manner of executing anatomical gifts, including that an attending physician may accept the gift on behalf of a specified donee.[13]

In light of the stated purposes of the statute, where effects on donees are never addressed, lawmakers may not have foreseen the statute being used by donees to obtain damages for misdirected organ donations. Just because donees are mentioned in the statute does not mean that a cause of action was created for them. Moreover, where the meaning of a statute is ambiguous, the court should avoid a construction that would be contrary to public policy. *See Waltham Watch Co. v. Keene*, 202 F. 225, 242 (S.D.N.Y.1913). As discussed in Part IV, *supra*, the narrow rights in a deceased's body are reserved exclusively for the next of kin and only for purposes of ensuring proper disposition of the deceased's body. Courts have consistently stated that it is against public policy to recognize broad property rights in the body of a deceased.[14] Against this backdrop, and absent a clear expression by the legislature, it would be inappropriate for the court to give donees rights to sue over the organs intended for them.[15]

---

**13.** The remaining provisions of Article 43 are § 4304 (delivery of document of gift), § 4305 (revocation of the gift), § 4306 (rights and duties at death), § 4307 (prohibition of sales and purchases of human organs), and § 4308 (prohibition on charging a fee to a donor's estate). These provisions are also geared towards facilitating organ donation and protecting the donor.

**14.** *See* discussion in Part IV, *supra*.

**15.** N.Y. Public Health Law Article 43 does seem to create a private right of action, as

In further support of this interpretation, N.Y. Public Health Law Article 43, as a whole, consistently limits the rights of the donee in favor of the donor's rights and the organ donation scheme. For example, the donee may accept or reject the organ donation, but the donee must reject it if authorized donation procedures are not followed or if the gift is contrary to the donor's wishes or religious or moral beliefs. Therefore, in addition to the public policy reasons already discussed, it would be inconsistent to recognize a cause of action for the donee based on a "right" to an organ, where such a right is never made absolute by the rest of the statute. The court is not in a position to confer broad "rights"—property or otherwise—to donees based on language that is inconsistent with public policy and legislative purposes expressed throughout the statute. Therefore, the court reads N.Y. Public Health Law Article 43, including § 4301(5) and the sections cited by plaintiff, as not giving standing to donees. Defendants' motion for summary judgment is granted on these claims.

B. *N.Y. Public Health Law Article 43–A*

[5] Regarding Article 43–A of the N.Y. Public Health Law, § 4351(7) states:

The provisions of [§ 4306(3) ][16] shall apply to this section. To the extent permissible under such subdivision, any person or organization acting pursuant to this section, shall be legally responsible for any negligent or intentional act or omission committed by such entity or its employees or agents.

The actions pursuant to § 4351 are those outlined in the statute, namely, the actions of hospital administrators, organ procurement organizations, eye banks, and tissue banks in requesting organ donations. On a preliminary note, the emphasis in this section appears to be on how these parties *make* requests for organ donations rather than on how they carry them out. Therefore, presumably, plaintiff's theory is that the defendants allegedly violated procedures set forth in § 4351 when speaking to Mrs. Lucia about the donation of her husband's kidneys. Although this provision states that persons may "be legally responsible" for negligent or intentional actions or omissions, the plain meaning of the statute does not tell us to whom such persons would be liable. Therefore, as with N.Y. Public Health Law Article 43, the court must consult legislative history.

Section 4351 was enacted in 1985, without subdivision (7), and focused mainly on the duties of hospital administrators with regard to asking the next of kin or other appropriate person to consider organ donation and filling out the necessary paperwork. 1985 N.Y. Laws, ch. 801, § 1. In 1997, § 4351 was repealed and replaced with a new § 4351, wherein subdivision (7)

§ 4306 provides: "A person who acts in good faith in accord with the terms of this article or with the anatomical gift laws of another state is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act." The one case found by the court involving § 4306 supports the court's interpretation that a private right of action should be consistent with the public policy of only recognizing a quasi-property right for the next of kin to ensure proper disposition of a deceased's body.

In *Nicoletta v. Rochester Eye & Human Parts Bank, Inc.*, plaintiff, the father of the deceased, sought relief under N.Y. Public Health Law Article 43 where the eyes of his son were removed based on the authorization of a woman, not the deceased's wife, who had lived with his son for ten years. 136 Misc.2d 1065, 519 N.Y.S.2d 928 (1987). Plaintiff argued that the hospital and eye bank defendants violated the procedures set forth in Article 43. The court granted summary judgment in favor of defendants because there was no evidence to indicate that they had not acted in good faith, which entitled them to immunity under § 4306(3). *Id.* at 931–33.

16. This section gives immunity to persons who act in good faith.

was included for the first time.[17] The purpose behind the 1997 amendments was "[t]o increase the supply of organs, by enhancing the process by which anatomical gifts are requested." 1997 N.Y. Laws, 2642. "The bill further ensures that the persons making the actual requests for donation be made by individuals who have been trained to most sensitively and effectively make a request for donation." *Id.*

It thus seems that legislators had in mind the manner and procedure by which hospital administrators and their representatives, in cooperation with organ procurement organizations and eye and tissue banks, should make requests for anatomical gifts. As with the provisions of N.Y. Public Health Law Article 43, there is no indication that lawmakers intended donees to have standing to sue under § 4351. Moreover, § 4351 does not mention donees at all. Thus, the legislative history for § 4351, alongside the statute as a whole, is consistent with not conferring standing to donees. Defendants' motion for summary judgment is granted as to this claim.

## VI. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied. The complaint is dismissed without costs to either party.

SO ORDERED.

---

**17.** Section 4351 was amended twice before, in 1990 and 1994, but these amendments did not involve subdivision (7).