[860 NE2d 713, 827 NYS2d 96]

PATRICIA COLAVITO, as Personal Representative for ROBERT CO-
LAVITO, Deceased, Appellant, v NEW YORK ORGAN DONOR
NETWORK, INC., et al., Respondents.

Argued November 14, 2006; decided December 14, 2006

**POINTS OF COUNSEL**

*Denise Winter Luparello,* Hicksville, and *Victor M. Serby,* Woodmere, for appellant. I. The applicable provisions of the New York Public Health Law vest the intended recipient of a directed organ donation with rights that can be vindicated in a private party's lawsuit sounding in (a) the common-law tort of conversion or (b) through a private right of action derived (inferred) from the New York Public Health Law. (*Ferres v City of New Rochelle,* 68 NY2d 446; *Logan v Zimmerman Brush Co.,* 455 US 422; *Matter of Medicon Diagnostic Labs. v Perales,* 74 NY2d 539; *Plaza Health Labs., Inc. v Perales,* 878 F2d 577; *Seaver v Ransom,* 224 NY 233; *Lawrence v Fox,* 20 NY 268; *Gruen v Gruen,* 68 NY2d 48; *Uribe v Merchants Bank of N.Y.,* 91 NY2d 336; *Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc.,* 63 NY2d 396; *Walker v Town of Hempstead,* 84 NY2d 360.) II. The New York Public Health Law does not immunize either negligent or grossly negligent misconduct. (*Nicoletta v Rochester Eye & Human Parts Bank,* 136 Misc 2d 1065; *Perry v Saint Francis Hosp. & Med. Ctr., Inc.,* 886 F Supp 1551; *Lyon v United States,* 843 F Supp 531.) III. Plaintiff may recover both nominal and punitive damages without demonstrating pecuniary loss or other actual injury. (*Confederated Tribes of Warm Springs Reservation of Or. v United States,* 248 F3d 1365; *Bigelow v RKO Radio Pictures, Inc.,* 327 US 251.)

*Wilson, Elser, Moskowitz, Edelman & Dicker LLP,* New York City (*Richard E. Lerner* and *Robin N. Gregory* of counsel), for respondents. I. Plaintiff never had a vested right to donor Peter Lucia's kidneys. Hence, he had no rights that could be vindicated in court. (*Gruen v Gruen,* 68 NY2d 48.) II. Absent proof of bad faith, there is no basis for any claim against an organ procurement organization. (*Nicoletta v Rochester Eye & Human Parts Bank,* 136 Misc 2d 1065; *Perry v Saint Francis Hosp. & Med. Ctr., Inc.,* 886 F Supp 1551; *Berrios v Our Lady of Mercy Med. Ctr.,* 20 AD3d 361.) III. There is no right to nominal or punitive damages. (*Cox v Microsoft Corp.,* 290 AD2d 206; *Zurich Ins. Co. v Shearson Lehman Hutton,* 84 NY2d 309; *Home Ins. Co. v American Home Prods. Corp.,* 75 NY2d 196; *Fernandez v Suffolk County Water Auth.,* 276 AD2d 466; *Garrity v Lyle Stuart, Inc.,* 40 NY2d 354; *Jenkins v Etlinger,* 55 NY2d 35; *Estate of Finn v City of New York,* 76 Misc 2d 388; *Lott v State of New York,* 32 Misc 2d 296; *Darcy v Presbyterian Hosp. in City of N.Y.,* 202 NY 259; *Correa v Maimonides Med. Ctr.,* 165 Misc 2d 614.)

*Eliot Spitzer, Attorney General,* Albany (*Caitlin J. Halligan, Daniel Smirlock* and *Owen Demuth* of counsel), for State of New York Department of Health, amicus curiae. I. The plain language of the statute and strong public policy indicate that an intended recipient of an organ donation has no rights that can be enforced through a common-law conversion action. (*Gruen v Gruen,* 68 NY2d 48; *Bower Assoc. v Town of Pleasant Val.,* 2 NY3d 617; *Town of Orangetown v Magee,* 88 NY2d 41; *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.,* 87 NY2d 36; *Employers' Fire Ins. Co. v Cotten,* 245 NY 102; *State of New York v Seventh Regiment Fund,* 98 NY2d 249; *Hartford Acc. & Indem. Co. v Walston & Co.,* 21 NY2d 219; *Gruntal v United States Fid. & Guar. Co.,* 254 NY 468; *Enright v Eli Lilly & Co.,* 77 NY2d 377; *Soon Duck Kim v City of New York,* 90 NY2d 1.) II. The interests of donees under the Uniform Anatomical Gift Act can be vindicated without recognizing a cause of action for conversion under the statute. (*Doe v Roe,* 190 AD2d 463; *Mark G. v Sabol,* 93 NY2d 710; *Sheehy v Big Flats Community Day,* 73 NY2d 629; *Brian Hoxie's Painting Co. v Cato-Meridian Cent. School Dist.,* 76 NY2d 207; *Carrier v Salvation Army,* 88 NY2d 298.) III. Public Health Law § 4306 (3) immunizes negligent and grossly negligent conduct. (*Nicoletta v Rochester Eye & Human Parts Bank,* 136 Misc 2d 1065; *Perry v Saint Francis Hosp. & Med. Ctr., Inc.,* 886 F Supp 1551; *Lyon v United States,* 843 F Supp 531; *Soma v Handrulis,* 277 NY 223; *First Natl. Bank of Odessa v Fazzari,* 10 NY2d 394;

*Manufacturers & Traders Trust Co. v Sapowitch,* 296 NY 226; *Berrios v Our Lady of Mercy Med. Ctr.,* 20 AD3d 361.)

*Alexandra K. Glazier,* Newton, Massachusetts, admitted pro hac vice, *Taylor, Duane, Barton and Gilman LLP,* Boston, Massachusetts (*Pamela S. Gilman* and *Andrew R. Weiner,* admitted pro hac vice, of counsel), and *John D. Persons, III,* Richmond, Virginia, admitted pro hac vice, for American Association of Tissue Banks and others, amici curiae. I. Applying the common-law property claim of conversion to the speculative ability of a potential recipient to benefit from the transplant of any specific organ is erroneous from both a legal and public policy perspective. (*Rubenstein v Rosenthal,* 140 AD2d 156; *Matter of Goodwin,* 114 Misc 39; *Matter of Signacon Controls v Mulroy,* 69 Misc 2d 63; *Matter of Union Indem. Ins. Co. of N.Y.,* 200 AD2d 99; *Brotherton v Cleveland,* 923 F2d 477; *Newman v Sathyavaglswaran,* 287 F3d 786; *Greenberg v Miami Children's Hosp. Research Inst., Inc.,* 264 F Supp 2d 1064.) II. The New York Public Health Law should be read to preserve the good faith immunity protection under the Uniform Anatomical Gift Act which immunizes against negligence. (*Nicoletta v Rochester Eye & Human Parts Bank,* 136 Misc 2d 1065.)

*O'Connell and Aronowitz, P.C.,* Albany (*Cornelius D. Murray* of counsel), for New York Alliance for Donation, Inc., amicus curiae. I. Articles 43 and 43-A of the Public Health Law do create a limited cause of action in favor of the donee of an anatomical gift in the event of wrongful deprivation, but in order to prevail, a donee must show that the human organ was medically compatible with his/her immune system. II. The Public Health Law immunizes organ procurement organizations from liability unless plaintiff can show that they did not act in good faith. (*Nicoletta v Rochester Eye & Human Parts Bank,* 136 Misc 2d 1065; *Berrios v Our Lady of Mercy Med. Ctr.,* 20 AD3d 361.) III. There is no basis for awarding punitive damages, and awarding them in a case such as this would seriously undermine the statute's underlying purpose.

### OPINION OF THE COURT

ROSENBLATT, J.

The case before us involves the purported gift of a kidney to plaintiff.* He asserts that as the specified donee of the organ, he

---

* He has since died and this appeal has been brought by his representative.

acquired a property right in it, giving rise to claims against defendants for delivering it to someone else. Plaintiff brought suit in federal court, and the United States Court of Appeals for the Second Circuit has certified questions to us relating to whether he has rights that would support his common-law conversion action or a statutory claim under Public Health Law articles 43 and 43-A.

## I

In August 2002 Peter Lucia died at defendant Good Samaritan Hospital on Long Island, from massive intracranial bleeding. His widow, Debra Lucia, sought to donate his kidney (or kidneys[1]) to plaintiff, Peter's longtime friend who had been suffering from end stage renal disease. Debra proceeded by going through defendant New York Organ Donor Network (NYODN). NYODN transplant coordinator defendant Spencer Hertzel concluded that Peter's kidneys were "not a perfect match, but they [were] good enough." Peter's left kidney was airlifted to Jackson Memorial Hospital in Miami, Florida, where plaintiff was awaiting its transplantation; Peter's other kidney remained in New York.

While preparing for the transplant during the early afternoon of August 23, 2002, Dr. George W. Burke, a surgeon at Jackson Memorial, inspected the donated kidney and discovered an aneurysm of the renal artery, making the kidney unsuitable for transplantation. He immediately contacted NYODN, asking for Peter's other kidney, and was informed that it had been allocated to someone else. The parties agree that NYODN had allocated the other kidney to another patient at about 11:25 A.M. that day.

Plaintiff brought suit against NYODN and others in the United States District Court for the Eastern District of New York, alleging fraud, conversion and violations of New York

---

**1.** The parties dispute whether Debra intended to donate one or both of her late husband's kidneys to plaintiff. Plaintiff claims both kidneys were directed to him. On the organ donation form Debra checked off that she wanted to donate her husband's "kidneys" but wrote in the appropriate blank that she was donating a "kidney" to plaintiff. Debra also testified that,

"What I wanted more than anything was for Bobby [plaintiff] to get a functioning kidney. If they needed both of them, that would have been fine. If they needed one, that would have been fine also. But he was to be taken care of. . . .

"As long as Bobby was taken care of and he was fine, then the [other] kidney could be given to another person."

For purposes of this case we will assume that Debra intended to donate both kidneys to plaintiff.

Public Health Law articles 43 and 43-A. Defendants moved for summary judgment and in support presented the deposition of Dr. Burke, in which he recounted the relevant events of August 23, 2002. He testified that when he found the first kidney unacceptable (owing to the aneurysm) the tissue-typing lab was performing other tests, reconfirming the blood group, retesting plaintiff's tissue and running cross-matching.[2] About 12 hours after discovering the aneurysm, Dr. Burke learned of the positive cross-match which, he said, would have prevented the successful transplant of either kidney.

Defendants also submitted an affidavit from Dr. Robert S. Gaston, Medical Director of the Kidney and Pancreas Transplantation programs at the University of Alabama. He reviewed the histocompatibility[3] studies for the proposed transplant and concluded that plaintiff was an inappropriate donee for either of Peter's kidneys and that any attempt at transplant would result in "hyperacute rejection" by plaintiff, whose antibodies would attack either of Peter's kidneys and cause damage immediately after transplantation. Defendants argued that for these and other reasons plaintiff had no viable common-law or statutory claim against them.

Plaintiff cross-moved for summary judgment, maintaining, as he does before us, that incompatibility is irrelevant to his claim that defendants misappropriated or diverted Peter's second kidney. He characterized the incompatibility determination as belated and suspect.

The District Court granted defendants' motion for summary judgment, denied plaintiff's cross motion and dismissed the complaint (*Colavito v New York Organ Donor Network, Inc.*, 356 F Supp 2d 237 [2005]). The court determined that plaintiff failed to state a cause of action for fraud, not having shown how he was harmed by any justifiable reliance on defendants' alleged misrepresentation.

In rejecting the conversion claim, the District Court held, in essence, that contract law ill-suits organ donations and that it

---

**2.** Cross-matching involves the interaction between donor and recipient antigens so as to predict the degree of compatibility. In pretransplantation cross-matching, the recipient's serum is mixed with potential donor lymphocytes to identify preformed antibodies in the recipient. If the cross-match is positive, the recipient and donor are incompatible. If the cross-match is negative, the transplant may proceed.

**3.** Testing for histocompatibility is a tissue-typing procedure performed on donors and recipients in kidney transplantations to match a donor with the most suitable recipient.

would be "inappropriate to expand the limited right that courts recognize in a deceased's body, which only belongs to the next of kin to ensure proper burial" (*id.* at 244). Lastly, the court concluded that in the absence of a clear legislative expression, neither Public Health Law article 43 nor article 43-A gives donees standing to bring a lawsuit.

On plaintiff's appeal, the Second Circuit agreed that he did not state a cause of action for fraud, but determined that the legal issues necessary to address the two remaining causes of action raised novel and important questions of New York law (*Colavito v New York Organ Donor Network, Inc.*, 438 F3d 214 [2006]).[4] The Second Circuit certified to us, and we accepted, the following questions:

> "(1) Do the applicable provisions of the New York Public Health Law vest the intended recipient of a directed organ donation with rights that can be vindicated in a private party's lawsuit sounding in the common law tort of conversion or through a private right of action inferred from the New York Public Health Law? (2) Does New York Public Health Law immunize either negligent or grossly negligent misconduct? (3) If a donee can bring a private action to enforce the rights referred to in question 1, may the plaintiff recover nominal or punitive damages without demonstrating pecuniary loss or other actual injury?" (*Id.* at 233.)

## II

### Conversion

To answer the first question we begin by addressing the tort of conversion. A conversion takes place when someone, intentionally and without authority, assumes or exercises control

---

4. In dissent, Judge Jacobs disagreed with the majority insofar as it certified questions to us. He would have affirmed the District Court

> "on the additional ground that (even if the [Public Health Law] affords a right of action to donees) Colavito suffered from no violation of the New York anatomical gift statute because there is no sustainable allegation of bad faith or negligence, because he received the only thing for which he could be a donee under the statute (a single kidney), and because there is no misdirection as a matter of law where the disposition of the donated organs accords with arrangements set out in the organ donor form" (438 F3d at 235).

over personal property belonging to someone else, interfering with that person's right of possession (*State of New York v Seventh Regiment Fund*, 98 NY2d 249 [2002]). Two key elements of conversion are (1) plaintiff's possessory right or interest in the property (*Pierpoint v Hoyt*, 260 NY 26 [1932]; *Seventh Regiment Fund*, 98 NY2d at 259) and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights (*Employers' Fire Ins. Co. v Cotten*, 245 NY 102 [1927]; *see also* Restatement [Second] of Torts §§ 8A, 223, 243; Prosser and Keeton, Torts § 15, at 92, 102 [5th ed]).

The first element is pivotal to our inquiry insofar as plaintiff's conversion cause of action necessarily rests on his claimed property right in the second kidney. We must examine the relevant common law to see whether he has such a right.

The Common Law Relative to Property Rights in the Body of a Deceased Person

We begin with an observation. The common law on this subject extends back for centuries while organ donation and transplantation are measured by mere decades. When discussing body parts of deceased persons, it is unlikely that our forbears had in mind that human organs might be transplanted to extend life or improve health.

As the common law developed, body parts were known to have value, not for transplantation, but for the study of medicine and anatomy. A good deal of the law arose out of religious and cultural sensibilities involving grave robbery, desecration of corpses and, later on, unauthorized autopsies.

Unlike other instances in which we consult the common law, this inquiry cannot possibly yield answers with perfect congruity considering the different context in which common-law courts dealt with this subject. Although the case before us is unprecedented, the common law offers enough guidance for us to answer the question confidently.

Early common-law writings on the subject go back to Lord Coke, whose 17th century pronouncement that a corpse has no value is a good starting point.[5] Coke's classic edict is of more than historical interest; it has been a staple of the common law.

---

5. (*See* 3 Edward Coke, Institutes of the Laws of England, at 203 [1644]; *see also Matter of Johnson*, 169 Misc 215 [Sur Ct, NY County 1938]; Ayala, *The Application of Traditional Criminal Law to Misappropriation of Gametic Materials*, 24 Am J Crim L 503, 517-518 [1977]; Boulier, *Sperm, Spleens, and Other Valuables: The Need to Recognize Property Rights in Human Body Parts*, 23 Hofstra L Rev 693, 705 [1995]; Carey, *The Disposition of the Body*

Blackstone reiterated the doctrine, asserting that heirs have no property right in the bodies or ashes of their ancestors, "nor can [an heir] bring any civil action against such as indecently at least, if not impiously, violate and disturb their remains, when dead and buried."[6]

One of this Court's earliest encounters with the subject was in *Patterson v Patterson* (59 NY 574, 583 [1875]). Adhering to the rule that no one can have a property right in a dead body, we held that a next of kin has only a right to possess the body for purposes of burying it, and a corresponding duty to do so.

Some years later, in *Foley v Phelps* (1 App Div 551 [1896]), a case of first impression in New York, the Court recognized a cause of action by a widow who suffered emotional distress occasioned by an unauthorized autopsy on her late husband. The Court insisted that it was not finding any property right in the body, invoking instead the widow's right and corresponding duty to bury a corpse, unmutilated. *Foley* relied, in part, on an 1880 case (*Snyder v Snyder*, 60 How Prac 368, 371 [1880]) in which the court ruled that there is no property right in the remains of a deceased but the person having charge of the

---

*After Death*, 19 Am L Rev 251 [1885]; Hernandez, *The Property of Death*, 60 U Pitt L Rev 971, 973 [1999]; Jackson, The Law of Cadavers, ch VI, at 123-183 [2d ed 1950]; Krauskopf, *The Law of Dead Bodies: Impeding Medical Progress*, 19 Ohio St LJ 455 [1958]; Sideman and Rosenfeld, *Legal Aspects of Tissue Donations From Cadavers*, 21 Syracuse L Rev 825 [1970]; Note, *The Sale of Human Body Parts*, 72 Mich L Rev 1182 [1974].)

The High Court of Justice in England and Wales also recognized that " 'it has now been common law for 150 years at least that neither a corpse nor parts of corpse are in themselves and without more capable of being property protected by rights' " (*AB v Leeds Teaching Hosp. NHS Trust*, [2004] EWHC 644, ¶ 135 [QB Div, Mar. 26, 2004]).

6. (2 William Blackstone, Commentaries on the Law of England, at 429 [1811].) As if to emphasize the point, Blackstone asserted that "if any one in taking up a dead body steals the shroud or other apparel, it will be a felony," but stealing the body itself is a misdemeanor (*id.*).

Owing to the need for body parts to study anatomy, a brisk industry of grave robbing by so-called "resurrectionists" emerged (Nelkin and Andrews, *Do the Dead Have Interests? Policy Issues for Research After Life*, 24 Am JL & Med 261, 262-265 [1998]). The English did not alter the common-law view that the corpse was worthless; instead, Parliament passed the Anatomy Act of 1832 to allow medical schools to use unclaimed bodies (Powhida, *Forced Organ Donation: The Presumed Consent to Organ Donation Laws of the Various States and the United States Constitution*, 9 Alb LJ Sci & Tech 349, 355-356 [1999]; *see also* Keller, *The Bed of Life: A Discussion of Organ Donation, its Legal and Scientific History, and a Recommended "Opt-Out" Solution to Organ Scarcity*, 32 Stetson L Rev 855, 864-865 [2003]).

remains holds them "as a sacred trust" (*see also* 2 Kinkead, Commentaries on the Law of Torts, at 881-883 [1903]).

In 1911, we cited *Foley* approvingly, and held that a mother had no property interest in her son's body, but had the right to protect it from unauthorized desecration. We sustained her cause of action for emotional distress brought on by an autopsy conducted over her objection (*Darcy v Presbyterian Hosp. in City of N.Y.*, 202 NY 259 [1911]).[7]

Six years later, in *Finley v Atlantic Transp. Co., Ltd.* (220 NY 249 [1917]), we upheld a cause of action for a plaintiff whose father died while on a transatlantic voyage and was cast out to sea, even though his body had been embalmed and in a perfect state of preservation. The defendant steamship operator was aware that the deceased's son was willing to defray any expenses involved in delivering the body. Concluding that the steamship company was answerable in damages for the son's anguish, we again emphasized that there is no right of property in a dead body in the ordinary sense of the term, but sustained the cause of action based on the sensibilities expressed in *Snyder*, *Darcy*, *Patterson*, *Foley* and similar cases.

We have been careful about characterizing causes of action that impose liability for violating these sensibilities and have disclaimed any reliance on a theory of property rights in a dead body.[8] Later cases in New York have continued to recognize causes of action for improper autopsy or mutilation (*see e.g. Juseinoski v New York Hosp. Med. Ctr. of Queens*, 18 AD3d 713 [3d Dept 2005]; *Liberman v Riverside Mem. Chapel*, 225 AD2d 283 [1st Dept 1996]; *Bambrick v Booth Mem. Med. Ctr.*, 190 AD2d 646 [2d Dept 1993]), but none have strayed meaningfully from

---

**7.** Other early wrongful autopsy cases recognized the same rule (*Grawunder v Beth Israel Hosp. Assn.*, 242 App Div 56 [2d Dept 1934]; *Hassard v Lehane*, 143 App Div 424 [1st Dept 1911]; *Jackson v Savage*, 109 App Div 556 [1st Dept 1905]). In *Hasselbach v Mount Sinai Hosp.* (173 App Div 89 [1st Dept 1916]), however, the Court found for the defendant hospital because it was not responsible for the unauthorized autopsy.

**8.** Prosser and Keeton (Torts § 12, at 63 [5th ed]) are critical of courts that have referred to a "property right" when according causes of action for emotional distress following unauthorized autopsies or mutilation. The authors assert that some courts have talked dubiously of this property right "which did not exist while the decedent was living, cannot be conveyed, can be used only for the one purpose of burial, and . . . has no pecuniary value." The property right in such cases, they go on to say, is a "fiction likely to deceive no one but a lawyer."

the doctrine that there is no common-law property right in a dead body.[9]

■ Considering, however, that the "no property right" jurisprudence was developed long before the age of transplants and other medical advances, we need not identify or forecast the circumstances in which someone may conceivably have actionable rights in the body or organ of a deceased person.[10] For purposes of this case it is enough to say, in answer to the first part of the first certified question, that plaintiff, as a specified donee of an incompatible kidney, has no common-law right to the organ. For that reason, his cause of action for conversion must fail, as it is necessarily based on his claimed right to possess the kidney in question.

We therefore turn to the second half of the first question: does plaintiff, a specified donee of an incompatible kidney, have a viable right of action under New York's Public Health Law?

## III

## Public Health Law Articles 43 and 43-A: New York's Version of the Uniform Anatomical Gift Act and Its Implementation

### Article 43

Given the lack of uniformity among state laws regulating organ donation, the National Conference of Commissioners on Uniform State Laws introduced the Uniform Anatomical Gift Act (UAGA) of 1968. The UAGA was designed to provide a nationwide law to "encourage the making of anatomical gifts" and "serve the needs of the several conflicting interests in a manner consistent with prevailing customs and desires in this country respecting dignified disposition of dead bodies" (Prefatory Note to Uniform Anatomical Gift Act of 1968). The UAGA identified the principal competing interests as:

"(1) the wishes of the deceased during his lifetime concerning the disposition of his body; (2) the

---

9. In one instance we referred to a "quasi-property right" in cases of this type (*Johnson v State of New York*, 37 NY2d 378, 382 [1975]; *see also* Clark, *Solving the Kidney Shortage Crisis Through the Use of Non-Heart-Beating Cadaveric Donors: Legal Endorsement of Perfusion as a Standard Procedure*, 70 Ind LJ 929 [1995]).

10. Judge Guido Calabresi discusses four legal approaches and how each would look at the question of whether we own our own bodies and their parts (*An Introduction to Legal Thought: Four Approaches to Law and to the Allocation of Body Parts*, 55 Stan L Rev 2113 [2003]).

desires of the surviving spouse or next of kin; (3) the interest of the state in determining by autopsy, the cause of death in cases involving crime or violence; (4) the need of autopsy to determine the cause of death when private legal rights are dependent upon such cause; and (5) the need of society for bodies, tissues and organs for medical education, research, therapy and transplantation" (*id.*).[11]

The UAGA gave any individual, of sound mind and 18 years or more of age, the right to donate all or any part of his or her body for any purpose specified in the act, with the gift to take effect upon death. If an individual does not express such a desire, family members may donate a deceased's organs posthumously, but are prohibited from making an anatomical gift if they know it contravenes the deceased's wishes. Every state, and the District of Columbia, has adopted some variation of the UAGA (*id.*).

With minor variation, New York codified the UAGA in 1970 as Public Health Law article 43 (L 1970, ch 466),[12] describing who may be a donor or donee of an anatomical gift, and how a gift may be executed or revoked. The law expressly prohibits

---

**11.** A number of commentators have written about ongoing issues in connection with the supply and transplantation of organs (*see* Boyd, *Considering a Market in Human Organs*, 4 NC JL & Tech 417 [2003]; Charo, *Skin and Bones: Post-Mortem Markets in Human Tissue*, 26 Nova L Rev 421 [2002]; Clark, *Solving the Kidney Shortage Crisis Through the Use of Non-Heart-Beating Cadaveric Donors: Legal Endorsement of Perfusion as a Standard Procedure*, 70 Ind LJ 929 [1995]; Crespi, *Overcoming the Legal Obstacles to the Creation of a Futures Market in Bodily Organs*, 55 Ohio St LJ 1 [1994]; Mahoney, *The Market for Human Tissue*, 86 Va L Rev 163 [2000]; Wagner, *Property Rights in the Human Body: The Commercialization of Organ Transplantation and Biotechnology*, 33 Duq L Rev 931 [1995]; Williams, *Combatting the Problems of Human Rights Abuses and Inadequate Organ Supply Through Presumed Donative Consent*, 26 Case W Res J Int'l L 315 [1994]; *see generally* Gold, Body Parts: Property Rights and the Ownership of Human Biological Materials [1996]; Scott, The Body as Property [1981]).

**12.** The UAGA of 1968 was later superseded by a newer version in 1987 (Uniform Anatomical Gift Act of 1987). The New York Legislature, however, did not adopt the 1987 revision.

A few years before the UAGA of 1987 was enacted, Congress passed the National Organ Transplant Act of 1984 (NOTA) (Pub L 98-507 [codified at 42 USC §§ 273-274g]) in response to the shortage of donated organs. NOTA essentially established a national health policy regarding organ procurement and allocation. NOTA called for the creation of the national Organ Procurement and Transplantation Network, the Scientific Registry of Transplant Recipients and the Task Force on Organ Transplantation. NOTA also developed federal grants for organ procurement organizations and prohibited the purchase of organs.

the exchange of valuable consideration for body parts for human transplantation. Section 4301 (5) recognizes that the "rights of the donee created by the gift are paramount to the rights of others." The statute, however, is silent as to what rights a donee has in a donated organ.

Article 43 contains a good faith immunity provision: section 4306 (3) states, "A person who acts in good faith in accord with the terms of this article or with the anatomical gift laws of another state is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act." The immunization was intended to help increase the organ supply by encouraging medical professionals to participate in the organ procurement process (*see People v Bonilla*, 95 AD2d 396, 404-405 [2d Dept 1983]).[13] Lastly, and of supreme importance to this case, Public Health Law § 4302 (4) allows donors to make a gift, effective upon death, to "any specific donee, *for therapy or transplantation needed by him*" (emphasis added).

Article 43-A

To enhance organ procurement and increase the supply of organs, the Legislature passed Public Health Law article 43-A in 1985, entitled "Request for Consent to an Anatomical Gift" (L 1985, ch 801, § 1). Section 4351, as originally enacted, obligated hospital administrators to follow certain procedures when seeking consent from a decedent's family members for an anatomical gift. In 1997 the Legislature repealed the 1985 law and replaced it with the current version of section 4351 (L 1997, ch 668, § 1). The statute now prescribes the duties of hospital administrators, organ procurement organizations, eye banks and tissue banks. Article 43-A also sets forth procedures for anatomical gift requests, and designates who may qualify as a "requestor" to "ensure[ ] that the request for [the] gift will be both effective with regard to organ procurement and sensitive to the needs of the family during a very difficult time" (Senate Mem in Support of L 1997, ch 668, 1997 McKinney's Session Laws of NY, at 2643).

Section 4351 (4) obligates hospitals to ask a deceased's family member (in a prescribed order of priority) to consent to the gift

---

**13.** *See also Carey v New England Organ Bank*, 17 Mass L Rep 582, 2004 WL 875623, *5, 2004 Mass Super LEXIS 132, *15 (2004); *Sattler v Northwest Tissue Ctr.*, 110 Wash App 689, 694, 42 P3d 440, 443 (Ct App, Div 1 2002); *Ramirez v Health Partners of S. Ariz.*, 193 Ariz 325, 333-334, 972 P2d 658, 666-667 (Ct App, Div 2 1998); *Brown v Delaware Val. Transplant Program*, 420 Pa Super 84, 90, 615 A2d 1379, 1382 (1992); *Williams v Hofmann*, 66 Wis 2d 145, 154-155, 223 NW2d 844, 848-849 (Sup Ct 1974).

of all or part of the deceased's body, unless there is reason to believe that the deceased would have objected. In keeping with concerns of tact and sensitivity, the statute goes so far as to provide that the person asking for consent be a trained "designated requestor" (Public Health Law § 4351 [5]).

The most vexing provision in article 43-A is section 4351 (7), to which the parties have dedicated an appreciable part of their arguments. It provides that "any person or organization acting pursuant to this section [i.e. section 4351, involving the duties of hospitals] *shall be legally responsible for any negligent or intentional act or omission committed by such entity or its employees or agents*" (emphasis added). The import of these words is altered, however, by the phrase preceding them, notably that the good faith immunity provision of article 43's section 4306 (3) applies. Thus, section 4351 (7) incorporates section 4306's good faith immunity provision and states that violators will be held responsible only "[t]o the extent permissible under such subdivision."

Plaintiff argues that the language—"legally responsible for any negligent or intentional act or omission"—implies a statutory cause of action for anyone harmed by defendants, and that he qualifies. He further asserts that the incorporated language of Public Health Law § 4306 (3) creates not a qualified immunity, requiring dismissal unless plaintiff can prove bad faith, but merely an affirmative defense, as to which defendants have the burden of proof—a burden he says they have not met.

Defendants maintain that the "legally responsible for any negligent or intentional act or omission" phrase in section 4351 (7) has nothing to do with rights of donors or donees, and that the words "legally responsible" contemplate responsibility as opposed to liability. Section 4351 (7), defendants argue, comes into play if, for example, a hospital fails to notify a federally designated organ procurement organization of a potential donor, enabling the commission to hold the hospital "responsible." Defendants thus maintain that, absent bad faith, they are immune from liability by virtue of section 4306 (3)'s imported "good faith" language.

The Second Circuit called section 4351 (7) "odd," in that when combined with the superimposed language of section 4306, it states that negligent persons "will be held legally responsible to the extent permissible under a provision which

shields negligent persons from liability" (438 F3d at 231 n 16). The court went on to speculate that good faith might be meant to include some but not all acts of negligence, or that section 4351 (7) makes negligent parties responsible for injunctive relief but section 4306 (3) shields them from personal liability.

The Attorney General offers yet another explanation of 4351 (7)'s perplexing language, suggesting that it refers only to article 43-A wrongdoing, involving procurement of anatomical gifts. He asserts it has no bearing on article 43, which deals with donors and donees and the type of allegations made here—the asserted misdelivery of an organ—which is covered by the good faith immunity of section 4306 (3). While we agree that the language of section 4351 (7) is unclear, it does not control our decision.[14] We rest our answer to the second half of the first question on section 4302 (4), which provides that a qualified donor may make a gift to any specified donee "for therapy or transplantation *needed by him*" (emphasis added). In other words, a donee is defined as someone who needs the donated organ.

■ As we have seen, plaintiff did not need the kidney in question. While he was in need of a functioning kidney, both of Peter's kidneys were of no use to plaintiff. Under the statutory scheme, gifts of a deceased donor are conditioned upon medical benefit to the intended recipient. Indeed, medical compatibility tests are specifically authorized "to *assure* medical acceptability of [the] gift" for transplant (Public Health Law § 4301 [4] [emphasis added]). Although plaintiff was the specified donee, that does not alter his status as someone who could not benefit from either kidney. In answer to the second part of the first question we conclude that because the kidneys were medically incompatible with plaintiff, he has no private right of action against defendants under the New York Public Health Law.

Accordingly, under the circumstances of this case, certified question No. 1 should be answered in the negative, and certified question Nos. 2 and 3 not answered as academic.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO, READ, SMITH and PIGOTT concur.

---

**14.** We have nonetheless identified the problems associated with the paradoxical language of section 4351 (7) to call it to the Legislature's attention.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified question No. 1 answered, under the circumstances of this case, in the negative, and certified question Nos. 2 and 3 not answered as academic.